OPINION
{¶ 1} Defendant-Appellant, Fred E. Ray, III, appeals from the judgment of the Union County Court of Common Pleas convicting him of possession of marijuana, possession of cocaine, attempted trafficking in marijuana, and attempted trafficking in cocaine. On appeal, Ray asserts that the trial court erred when it admitted other acts testimony; that the trial court erred when it admitted hearsay statements; that the trial court erred when it admitted rebuttal testimony; that he was deprived of his right to the effective assistance of counsel; that he was deprived of the right to a fair trial; and, that the trial court erred when it overruled his motion for a new trial. Based on the following, we affirm the judgment of the trial court in part, reverse in part, and remand for further proceedings consistent with this opinion.
 {¶ 2} In June of 2005, the Union County Grand Jury indicted Ray for one count of possession of marijuana in violation of R.C.2925.11(A), (C)(3)(d), a felony of the third degree, one count of possession of cocaine in violation of R.C. 2925.11(A), (C)(4)(b), a felony of the fourth degree, one count of attempt, as it relates to trafficking in marijuana, in violation of R.C.2923.02, a felony of the third degree, and one count of attempt, as it relates to trafficking in cocaine, in violation of R.C.2923.02, a felony of the fourth degree. Subsequently, Ray pled not guilty to all four counts in the indictment.
 {¶ 3} On August 23, 2005, a jury trial was held. Prior to trial, Ray's wife, Lesa Ray, asserted both her privilege against any possible self-incrimination and her privilege against having to testify against her husband. At trial, the following testimony was presented:
 {¶ 4} The State's first witness was Officer Mark Coffman,[1] an investigator with the City of Kenton Police Department, who testified that on February 16, 2005, officers of the Kenton Police Department were called to a domestic dispute involving Ray and his wife, in Kenton, Ohio.[2] Officer Coffman stated that after the officers resolved the domestic dispute, the officers told him that they recovered two small bags of marijuana from underneath a mattress in Ray's residence. Also, Officer Coffman testified that he notified Detective Justice of the Union County Sheriff's department about marijuana and cocaine allegedly located at the Tack Room, which is a bar in Magnetic Springs, Ohio.[3] Further, Officer Coffman testified that he talked to Ray's wife about the domestic dispute and that she gave him a sworn written statement, which he faxed to Detective Justice.
 {¶ 5} On cross-examination, Officer Coffman testified that Ray's wife was angry with Ray and gave him specific information about a pound of marijuana and a half ounce of cocaine, including where the drugs were located at the Tack Room. Officer Coffman continued that he forwarded this information to Detective Justice. Officer Coffman testified that he did not arrest Ray's wife "when she told [him] that there were drugs of certain description, certain quantity, and a certain location * * *", because the events did not occur within his jurisdiction. (Trial Tr. p. 39). Additionally, Officer Coffman testified that he was not involved in the search for the drugs at the Tack Room, because it was not part of his jurisdiction.
 {¶ 6} On redirect examination, Officer Coffman stated that Ray's wife, in her written statement, had alleged that "[Ray] keeps [the drugs] at the Tack Room in the back room and there's about a * * * pound of weed and about a half ounce of cocaine. It's in the stock room behind the wall in a purple Crown Royal bag and the weed is in a white bag somewhere in the back room maybe the cooler." (Trial Tr. pp. 40-41). Officer Coffman also testified that she provided information to the officers that drugs were located in her own house underneath the mattress in the bedroom. Officer Coffman then answered three questions that were submitted by the jury. These questions included,
THE COURT: * * * did [Ray's wife] say whose * * * drugs thosewere?
 A. In her initial report and also in her written statement shesaid they were [Ray's].
(Trial Tr. pp. 44-45).
 {¶ 7} After the jury asked its questions, Officer Coffman was asked on redirect examination, how Ray's wife revealed that there was marijuana under the mattress in Ray's home. Officer Coffman answered, "As Mr. Ray was outside of the residence and the officers were there, she yelled out of the window to him and asked him if he wanted his weed." (Trial Tr. p. 44). Officer Coffman continued that she revealed the location of the marijuana "[b]ecause one officer said that he would take it." (Trial Tr. p. 44). Additionally, Officer Coffman was asked about what Ray's wife told him concerning the drugs that were supposedly located in the Tack Room. To which, Officer Coffman answered, "[Ray's wife] said that the drugs would still be there unless me (Sic.) made a phone call and had them removed out to his truck. And that he usually reups his supply on Friday's. (Sic.) And as of that time, he should still have an amount left at his establishment." (Trial Tr. p. 45).
 {¶ 8} The State's second witness was Detective Kevin Weller of the Union County Sheriff's office. Detective Weller testified that on February 16, 2005, Detective Justice notified him that he had received information from Officer Coffman, who received information from Ray's wife, about drugs located at the Tack Room. Detective Weller continued that based on that information, liquor control agents from the Department of Public Safety were contacted to conduct an administrative search of the Tack Room. Detective Weller testified that at approximately 6:35 p.m., he arrived at the Tack Room with Detective Justice and two liquor control agents. Detective Weller continued that when he entered the Tack Room, Ray was working at the bar.
 {¶ 9} Detective Weller testified that after entering the Tack Room, the liquor control agents spoke to Ray, informing him why they were there, and asked Ray "to open any and all storage and office rooms * * * for inspection." (Trial Tr. p. 50). Detective Weller noted that Ray stated that he did not have the keys to open the storage and office rooms, but that his father did. Detective Weller continued that Ray's father was called and came to the Tack Room; that the liquor control agents asked Ray's father to open the door to the storage room; and, that Ray's father did not have the keys, but took a set of keys from Ray and attempted to open the door to the storage room, which he was unable to open. Detective Weller then stated that a liquor control agent told Ray's father that if he was unable to open the door, then it would have to be forced open, after which Ray took the keys that he had in his possession when the police arrived and opened the door to the storage room.
 {¶ 10} The State's third witness was Agent Doug Mullett of the Ohio Investigative Unit under the Ohio Department of Public Safety. Agent Mullett testified that his agency is responsible for investigating all crimes committed in bars, liquor control violations, and food stamp violations. Agent Mullett continued that on February 16, 2005, he received a call from Detective Justice requesting assistance with an inspection at the Tack Room. Agent Mullett continued that he called another agent and went down to assist Detective Justice. Agent Mullett noted that when they entered the Tack Room, Ray was the bartender.
 {¶ 11} Agent Mullett testified that when Ray was asked to open the storage room, Ray stated, "he had a key to the room but would not open it until his father got [to the Tack Room]." (Trial Tr. p. 77). Agent Mullett also noted that Ray was placed under arrest for hindering and obstructing official business.
 {¶ 12} Agent Mullet continued that after Ray's father arrived at the Tack Room, Ray's father retrieved the keys from Ray and unsuccessfully attempted to open the storage room. After unsuccessfully attempting to open the storage room, Ray's father requested that Ray be allowed to unlock the door, which Ray did successfully. Agent Mullett testified that after the storage room was opened, he noticed a "very strong smell of marijuana" upon entering the storage room. (Trial Tr. p. 79). Agent Mullett continued that he conducted a search of the storage room and found "green vegetation that appeared to be marijuana" (trial tr. p. 80) and a purple Crown Royal bag, which contained a "white powder substance." (Trial Tr. p. 81). Agent Mullett continued that after he found the drugs, he notified Deputy Mike Coutts, who obtained a search warrant.
 {¶ 13} Agent Mullett also testified that the officers found an access to the storage room's attic and attempted to open it. Agent Mullett testified that when he was boosted up through the attic panel, he found two gallon size Ziploc bags of vegetation, which appeared to contain marijuana. Agent Mullett also noted that he thought one of the officers located a triple beam scale in the bar and did not know why a triple beam scale would be needed at a bar.
 {¶ 14} On cross-examination, Agent Mullett agreed that Ray stated that he did not have the authority to permit the liquor control agents to search the locked rooms in the Tack Room and that Ray's father, as the owner of the Tack Room, needed to give Agent Mullett authority to search the locked rooms. Additionally, Agent Mullett agreed that his only involvement in this case was finding the drugs in the storage room, and that the Union County Sheriff's office conducted the rest of the search and took custody of the drugs. Further, Agent Mullett agreed that the triple beam scale that was found could have been used to measure the weight of food that was sold in the restaurant portion of the Tack Room.
 {¶ 15} The State's fourth witness was Ray's father, Fred Ray, Jr. Ray's father testified that he was the owner of the Tack Room and its liquor license. Ray's father also testified that Ray's wife comes in and helps at the Tack Room, but she was not an employee. Ray's father also identified three other employees, not including himself or Ray, who served at the Tack Room during February of 2005. Additionally, Ray's father testified that the Tack Room did have dancers, but to his knowledge, they were not allowed in the storage room. Further, Ray's father stated that Ray possessed the key to the storage room and that the storage room door had been changed within the past couple months because the prior door was bad. Finally, Ray's father stated that the drugs taken out of the storage room were not his.
 {¶ 16} On cross-examination, Ray's father testified that he was unsure if he or Ray's wife actually possessed a key to the storage room. On redirect examination, Ray's father stated that Ray was an assistant manager of the Tack Room and that Ray was not allowed to own any part of the bar. Additionally, Ray's father testified that to his knowledge the other employees, who worked at the Tack Room, did not have a key to the storage room.
 {¶ 17} The State's fifth witness was Deputy Scott Robinson of the Union County Sheriff's office. Deputy Robinson testified that after a search warrant was obtained, he brought his drug dog and conducted a search of the Tack Room. Deputy Robinson identified multiple times when his dog alerted him to the odor of narcotics, including outside the rear passenger door of a black Jeep Cherokee located outside of the Tack Room, in the back left corner of the storage room inside the Tack Room, and several other places inside the Tack Room.
 {¶ 18} The State's sixth witness was Pamela Shank, a bartender and short order grill cook at the Tack Room. Ms. Shank testified that on February 16, 2005, she was employed at the Tack Room. Additionally, Ms. Shank testified that only Ray had keys to the Tack Room's storage room. Ms. Shank continued that after the raid on February 16th, Ray told her that she and Ray's father would be given a key to the storage room. Further, Ms. Shank testified that prior to obtaining a key to the storage room, when deliveries came to the Tack Room, she would have to wait until Ray arrived to put the stock away, because she did not have access or a key to the storage room. Ms. Shank also noted that she was unaware if Ray's wife had a key to the storage room.
 {¶ 19} Ms. Shank also testified about instances when Ray would go to the men's restroom, which was located adjacent to the storage room, with two or three other people. Ms. Shank testified that when Ray would go back to this restroom, other men would go in after him and Ray would stay "in there for a while." (Trial Tr. p. 156).
 {¶ 20} On cross-examination, Ms. Shank admitted that at times Ray's wife would manage the Tack Room's bar and during those times, no one would question who was in charge of the bar. Additionally, Ms. Shank testified that she never observed Ray's wife go in or out of the storage room when Ray was not at the Tack Room. Ms. Shank also admitted that she never saw Ray sell or offer to sell anyone marijuana or cocaine.
 {¶ 21} The State's final witness was Detective Michael Justice, a detective within the organized crime bureau at the Union County Sheriff's office. Detective Justice testified that on February 16, 2005, he was given information concerning the Tack Room and Ray, and with that information, he went to the Tack Room. Detective Justice also testified about the events leading to the opening of the storage room door and confirmed that Ray had the key in his possession to open the door. Detective Justice also discussed the search of the storage room, the odor of marijuana inside the storage room, that approximately a quarter pound of marijuana was found inside the storage room, and that a triple beam scale was lying on the floor in the corner of the storage room. Additionally, Detective Justice testified that in his experience, a triple beam scale is commonly used for weighing pounds of drugs.
 {¶ 22} Detective Justice also testified that three individual bags of alleged marijuana were taken to the Bureau of Criminal Investigations and Identifications (hereinafter referred to as "BCI") in London, Ohio for identification. Detective Justice also noted that a Crown Royal bag that contained a plastic baggy of alleged cocaine was taken to BCI for identification. Next, Detective Justice testified that the report from Beverly Wiltshire, a forensic scientist at BCI, stated that the three bags contained 119.13, 444.34, and 438.17 grams of marijuana respectively and the Crown Royal bag contained 8.22 grams of cocaine.[4] Additionally, Detective Justice confirmed that the marijuana that was found was almost double the amount that he was advised he might find and that less cocaine was found than he was advised he might find. Detective Justice also discussed the street value of the drugs that were found at the Tack Room.
 {¶ 23} On cross-examination, Detective Justice was asked about other investigations concerning the Tack Room prior to February 16, 2005. Detective Justice answered that he was personally involved in at least two drug trafficking investigations and that he was aware of a long term ongoing investigation. Detective Justice also noted that nothing came out of those investigations because their "CI died from medical reasons." (Trial Tr. p. 200).
 {¶ 24} Additionally, Detective Justice testified that he arrived at the Tack Room approximately two hours after he received word about the domestic situation between Ray and Ray's wife.
 {¶ 25} After the State's case-in-chief, Ray moved under Crim.R. 29 for judgment of acquittal on all counts of the indictment, which the trial court overruled.
 {¶ 26} Ray's first witness was Brent Scheiderer, a regular at the Tack Room. Mr. Scheiderer testified that Ray had employed him to do maintenance work at the Tack Room and at Ray's personal residence. Mr. Scheiderer testified that he had to cut locks off of the storage room four times in the past year and a half.
 {¶ 27} Mr. Scheiderer also testified that on February 16, 2005, he was at Ray's house and heard Ray and Ray's wife have an argument; that he was at Ray's house when the police arrived; and, that later in the day, he was at the Tack Room when the sheriffs arrived, but left before the search of the premises was executed.
 {¶ 28} On cross-examination, Mr. Scheiderer stated that he had been with Ray when Ray left the house during the domestic dispute and heard Ray's wife yell about Ray's marijuana. Also, Mr. Scheiderer testified that he had been in the Tack Room's storage room by himself many times in order to complete repairs; that he had nothing to do with the new door which was on the storage room; and, that he had seen Ray go into the restroom area with other people.
 {¶ 29} On redirect examination, Mr. Scheiderer testified that Ray had never offered to sell him nor had he seen Ray sell or offer to sell drugs to anyone at the Tack Room.
 {¶ 30} Ray's final witness was his mother, Patricia Gordon. Mrs. Gordon testified that she worked at the Tack Room from approximately the first of February until the twenty-third of February. Mrs. Gordon also testified that only Ray and Ray's wife had keys to the storage room and that she and Ms. Shank did not have keys to the storage room. On cross-examination, Mrs. Gordon testified that she was unaware of any drugs located at the Tack Room other than those found in the drug bust.
 {¶ 31} After Mrs. Gordon testified, the State called Helen Tucker as a rebuttal witness. The State stated in a side bar conference prior to her testimony,
Miss Tucker was asked to come to testify and was offered moneyby [Ray] to lie on his behalf if he offered her a $200 bonus,$275 a week. She quit the bar. And to argue or to say to the jurythat she had a key that would often come in to go * * * into thestock room in February of 2005. I want to make the Court aware* * * of the nature of her testimony prior to calling her.
(Trial Tr. p. 245). Additionally, the State asserted that the basis for her rebuttal testimony was the idea "that other people had keys [to the storage room], other people had access to [the storage room]. And that's what the testimony is. Simply not true, but I just want to show * * * what she was asked to testify to." (Trial Tr. p. 246-47).
 {¶ 32} Ms. Tucker testified that she started working at the Tack Room in April of 2005 and was not employed at the Tack Room in February of 2005. Ms. Tucker also stated that Ray came to her house and asked her if she would testify for him. Specifically, Ms. Tucker stated that Ray wanted her to "state that [she] worked [at the Tack Room] helping him out in the evenings prior to being employed there." (Trial Tr. p. 249). Additionally, Ms. Tucker testified that Ray had offered her $200 once the court hearing and everything was over, if she would come and testify. Ms. Tucker noted that she quit working at the Tack Room on the same day that she was offered the $200 to testify.
 {¶ 33} Additionally, on recross examination, Ms. Tucker stated, "[Ray] wanted me to say that I had access to the [storage] room and was helping him do stock at night before I started working there, in which that was never the case." (Trial Tr. p. 257). Further, Ms. Tucker stated that after Ray had offered her the $200 and she quit, Ray wanted her to go with a new strategy, to tell the truth.
 {¶ 34} After deliberations, the jury returned a guilty verdict on all four counts of the indictment. Subsequently, at the sentencing hearing, Ray was sentenced to twelve months in prison on the possession of cocaine and attempt as it relates to trafficking in cocaine counts, each a felony of the fourth degree, to be served concurrently to one another and was sentenced to four years in prison on the possession of marijuana and attempt as it relates to trafficking in marijuana counts, each a felony of the third degree, to be served concurrently to one another and consecutively to the fourth degree felonies.
 {¶ 35} On August 31, 2005, Ray filed a motion for a new trial under Crim.R. 33(A)(1) (2). The trial court overruled Ray's motion stating, "the Entry of Verdict and Sentence having been filed on August 24, 2005, the Court finds, under the provisions of Ohio Revised Code Section 2945.80, that the Motion was filed out of rule and is therefore OVERRULED." (Aug. 31, 2005 Journal Entry).
 {¶ 36} On September 7, 2005, Ray filed a motion to reconsider his motion for new trial upon the basis of newly discovered evidence and for a hearing upon same, which was subsequently overruled. Specifically, the journal entry provided, in toto, "The Defendant having filed a Motion to Reconsider and requesting oral hearing, said Motion is OVERRULED." (Sept. 8, 2005 Journal Entry) (emphasis in original).
 {¶ 37} It is from the trial court's conviction and sentence that Ray appeals, presenting the following assignments of error for our review:
 Assignment of Error No. I THE TRIAL COURT ERRED WHEN IT ADMITTED THE TESTIMONY OF MARKCOFFMAN. [TR. 32-46]
 Assignment of Error No. II THE TRIAL COURT ERRED WHEN IT ADMITTED THE HEARSAY STATEMENTSOF LESA RAY. [Tr. 36-47, 40-41, 44-45, 201].
 Assignment of Error No. III THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED THEREBUTTAL TESTIMONY OF HELEN TUCKER. [Tr. 249]
 Assignment of Error No. IV THE ACTS AND OMISSIONS OF THE TRIAL COUNSEL DEPRIVED THEAPPELLANT OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.
 Assignment of Error No. V THE CUMULATIVE PREJUDICE RESULTING FROM ALL OF THE ERRORS INTHE TRIAL COURT DEPRIVED THE APPELLANT OF A FAIR TRIAL.
 Assignment of Error No. VI THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION FORA NEW TRIAL.
 {¶ 38} Due to the nature of Ray's assignments of error, we will address them out of order.
 Assignments of Error Nos. I II {¶ 39} In his first assignment of error, Ray argues that the trial court erred when it admitted the portion of Officer Coffman's testimony addressing the two small bags of marijuana found at Ray's residence. Specifically, Ray asserts that none of Officer Coffman's testimony about the two small bags of marijuana was relevant to the cocaine and marijuana for which the Union County Grand Jury subsequently indicted him. In his second assignment of error, Ray argues that the trial court erred when it admitted the hearsay statements of Ray's wife concerning marijuana and cocaine he possessed at his residence and at the Tack Room. Specifically, Ray asserts that the trial court's admission of her hearsay statements violated his Sixth Amendment right to confrontation. Because these assignments of error are interrelated, we will address them together.
 {¶ 40} In these assignments of error, Ray asserts that specific portions of Officer Coffman's testimony should not have been admitted into evidence. However, an examination of the trial transcript reveals that Ray never objected during Officer Coffman's testimony. Since Ray failed to object to Officer Coffman's testimony, he is generally barred from introducing the alleged error on appeal under Evid.R. 103(A)(1). Evid.R. 103(A) provides, in pertinent part:
 Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) Objection. In case the ruling is one admitting evidence,timely objection or motion to strike appears of record statingthe specific ground of objection, if the specific ground was notapparent from the context * * *.
Evid.R. 103(D) provides an exception to this general rule, allowing us to review the trial court's inclusion of Officer Coffman's testimony under the plain error standard. Under the plain error standard, we must first find error, "a deviation from a legal rule." State v. Barnes, 94 Ohio St.3d 21, 27,2002-Ohio-68. "Plain error occurs when, but for the error, the outcome of the trial clearly would have been otherwise." Statev. Allen, 73 Ohio St.3d 626, 634-35, 1995-Ohio-283; State v.Long (1978), 53 Ohio St.2d 91, 96-97.
 {¶ 41} In the case subjudice, Officer Coffman's testimony about the Ray's domestic disturbance and the marijuana found at Ray's residence was obviously unfairly prejudicial to Ray and was unnecessary for the prosecution of the case. We do not condone the State offering such immaterial testimony. However, we cannot conclude that, but for its inclusion, the outcome of the trial clearly would have been otherwise. There was substantial compelling evidence in this case on which the jury could reach a finding of guilty.
 {¶ 42} Additionally, Ray argues that Officer Coffman's testimony about Ray's wife's identification of the amount of and location of cocaine and marijuana at the Tack Room on redirect examination constitutes prejudicial hearsay.
 {¶ 43} It is clear from the record that Ray's counsel first broached the subject of hearsay statements made by Ray's wife regarding the cocaine and marijuana located in the Tack Room.[5] Ray now claims that it was error for the trial court to allow the State to elicit, on redirect examination, the same testimony.
 {¶ 44} "The doctrine of invited error holds that a litigant may not `take advantage of an error which he himself invited or induced.'" State v. Campbell, 90 Ohio St.3d 320, 324,2000-Ohio-183, quoting Hal Artz Lincoln-Mercury, Inc. v. FordMotor Co. (1986), 28 Ohio St.3d 20, paragraph one of the syllabus. Under the invited error doctrine, Ray cannot now complain that this hearsay testimony was allowed into evidence after his counsel induced the court to allow such evidence into the record.
 {¶ 45} Because the admission of Officer Coffman's testimony about the Ray's domestic disturbance and the marijuana found at Ray's residence did not rise to plain error and since Officer Coffman's testimony about Ray's wife's statements regarding the location of and the amount of cocaine and marijuana at the Tack Room was invited error, Ray's first and second assignments of error are overruled.
 Assignment of Error No. III {¶ 46} In his third assignment of error, Ray argues that the trial court abused its discretion when it admitted Ms. Helen Tucker's rebuttal testimony. Specifically, Ray asserts that the State did not demonstrate that Ms. Tucker's testimony rebuts matters first raised in its case in chief and could not have been brought in its case in chief. We disagree.
 {¶ 47} The Ohio Supreme Court has held "[r]ebutting evidence is that given to explain, refute, or disprove new facts introduced into evidence by the adverse party; it becomes relevant only to challenge the evidence offered by the opponent, and its scope is limited by such evidence." State v. McNeill,83 Ohio St.3d 438, 446, 1998-Ohio-293, citing N.W. Graham Co.v. W.H. Davis Co. (1854), 4 Ohio St. 362, 381. Further, "[i]t is within the trial court's discretion to determine what evidence is admissible as proper rebuttal." McNeill,83 Ohio St.3d at 446, citing N.W. Graham Co., supra; State v. Dunlap,73 Ohio St.3d 308, 316, 1995-Ohio-243. Thus, a trial court's decision regarding the admission of rebuttal testimony will not be reversed unless the trial court's decision was unreasonable, arbitrary or unconscionable. State v. Finnerty (1989),45 Ohio St.3d 104, 107-08.
 {¶ 48} During its case in chief, the State introduced evidence attempting to link Ray to the drugs found inside the Tack Room's storage room, because Ray had exclusive control of the key to the storage room. In response, during the defense's case in chief, Ray presented evidence regarding the practice of having multiple keys to the storage room and Ray's wife having a key to the storage room. Specifically, Mr. Scheiderer testified that he had installed replacement doors for the storage room and that there were always multiple keys to the room. Additionally, Mr. Scheiderer stated that he had seen Ray's wife have access to the storage room. Further, Ms. Gordon testified that both Ray and Ray's wife had keys to the storage room.
 {¶ 49} During rebuttal, the State called Ms. Tucker to testify. Ms. Tucker testified that Ray had come to her house and had asked her to testify that she had access to the storage room and that she helped him restock the storage room prior to her April 2005 employment. Additionally, Ms. Tucker testified that Ray offered her $200 to testify to what Ray had asked, which she did not accept.
 {¶ 50} Here, Ray introduced new evidence in his case in chief. Specifically, Ray's witnesses testified that he did not have exclusive access to the storage room and that there were multiple keys typically made for the lock on the storage room door. The State introduced Ms. Tucker's testimony to rebut Ray's contention that he did not have exclusive access to the storage room and that multiple keys were made. Therefore, the trial court did not abuse its discretion in permitting Ms. Tucker's testimony.
 {¶ 51} Accordingly, Ray's third assignment of error is overruled.
 Assignment of Error No. VI {¶ 52} In his sixth assignment of error, Ray argues that the trial court erred in overruling his motion for a new trial. Specifically, Ray asserts that he had timely filed his motion for a new trial. We agree.
 {¶ 53} A motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. Statev. Farley, 10th Dist. No. 03AP-555, 2004-Ohio-1781, at ¶¶ 6-7. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 54} As noted above, Ray's verdict and sentence was filed on August 24, 2005 and Ray filed a motion for new trial on August 31, 2005. In its journal entry denying Ray's motion, the trial court stated, "the Entry of Verdict and Sentence having been filed on August 24, 2005, the Court finds, under the provisions of Ohio Revised Code Section 2945.80, that the Motion was filed out of rule and is therefore OVERRULED." (August 31, 2005 Journal Entry).
 {¶ 55} R.C. 2945.80 requires that an "[a]pplication for a new trial shall be made by motion upon written grounds, and * * * shall be filed within three days after the verdict was rendered * * *."
 {¶ 56} Under Crim.R. 33(B) the motion for new trial must be filed "within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived * * *." Ray contends that the conflict between R.C. 2945.80 and Crim.R. 33(B) requires the application of the time limits in Crim.R. 33(B).
 {¶ 57} Section 5(B), Article IV, of the Ohio Constitution, prescribes in part: "The supreme court shall prescribe rulesgoverning practice and procedure in all courts of the state, which rules shall not abridge, enlarge, or modify any substantive right. * * * All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." (Emphasis added).
 {¶ 58} Crim.R. 33(B) is purely procedural in character.State v. Straub (June 17, 1983), 4th Dist. No. 912. It does not create, affect or alter the right to a new trial, but merely controls the timing of the motion for such. Id. Therefore, Crim.R.33(B) supersedes the conflicting provision contained in R.C. 2905.80. Thus, Ray's motion for a new trial was timely filed. The trial court's denial of said motion on the basis that it was filed out of rule was unreasonable.
 {¶ 59} Accordingly, Ray's sixth assignment of error is sustained.
 Assignment of Error No. IV {¶ 60} In his fourth assignment of error, Ray argues that he was deprived of his right to effective assistance of counsel and was prejudiced as a result. Specifically, Ray asserts that his trial counsel erred by failing to object to Officer Coffman's testimony relating to the domestic disturbance between Ray and Ray's wife; that his trial counsel erred by adducing highly prejudicial testimony from Officer Coffman on cross-examination; that his trial counsel erred by failing to object to the prosecutor's introduction of hearsay statements of Ray's wife; that his trial counsel unreasonably responded to testimony relating to past investigations of the Tack Room and himself; and, that his defense counsel performed deficiently to the extent that he did not preserve the rebuttal issue for review by this Court. We disagree.
 {¶ 61} An ineffective assistance of counsel claim requires proof that a trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. State v. Bradley (1989),42 Ohio St.3d 136, paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. State v. Waddy (1992), 63 Ohio St.3d 424, 433, superseded by Constitutional amendment on other grounds as recognized by State v. Smith, 80 Ohio St.3d 89, 103,1997-Ohio-355.
 {¶ 62} Furthermore, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. State v. Malone (Dec. 13, 1989), 2d Dist. No. 10564. "Ineffective assistance does not exist merely because counsel failed `to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" Id. quoting Smith v. Murray (1986), 477 U.S. 527.
 {¶ 63} Trial tactics that are debatable generally do not constitute a deprivation of effective counsel. State v.Phillips, 74 Ohio St.3d 72, 85, 1995-Ohio-171. Furthermore, trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel. State v. Lockett, 49 Ohio St.2d 48, paragraph nine of the syllabus, reversed in part by Lockett v. Ohio (1978),438 U.S. 536, overruled on other grounds in State v. Downs (1977),51 Ohio St.2d 47.
 {¶ 64} In this case, the nexus of Ray's arguments was that his defense counsel was ineffective for failing to object to and adducing the admission of highly prejudicial and irrelevant evidence at the trial. We note that certain testimony of immaterial facts clearly should not have been introduced by the State, nor permitted by the trial court.[6] However, upon our review of the record, the actions of Ray's trial counsel appear to have been tactical or strategic trial decisions.
 {¶ 65} As such, the actions or inactions of Ray's trial counsel do not fall below an objective standard of reasonable representation. Nor, in this case, did they create any reasonable probability of a different outcome. Moreover, tactical or strategic trial decisions, even if ultimately unsuccessful, will not substantiate a claim of ineffective assistance of counsel.State v. Grimes, 3d. Dist. No. 14-05-20, 2006-Ohio-2144, at ¶26 citing State v. Garrett (1991), 76 Ohio App.3d 57, 61.
 {¶ 66} Accordingly, Ray's fourth assignment of error is overruled.
 Assignment of Error No. V {¶ 67} In his fifth assignment of error, Ray asserts that the cumulative prejudice resulting from all of the trial court's errors deprived him of a fair trial. We disagree.
 {¶ 68} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." State v.Baucom, 3d Dist. No. 17-03-14, 2003-Ohio-6986, at ¶ 6, quotingState v. Leach, 150 Ohio App.3d 567, 2002-Ohio-6654, at ¶ 57. In order for Ray to show that the cumulative effect of the errors had the effect of denying him of his right to a fair trial, he must establish that there is a reasonable probability that without these errors, the outcome of the trial would have been different. State v. Wyckhouse (May 21, 1997), 3d Dist. No. 7-96-07, citing State v. Moreland (1990), 50 Ohio St.3d 58, 69.
 {¶ 69} While a portion of the trial court's decision is being remanded as to Ray's sixth assignment of error, the errors contained therein only involve post-conviction matters, i.e., a motion for a new trial. The remainder of Ray's contentions deal with his trial and have been overruled. Based on our discussions of each alleged error, we cannot conclude that there is a reasonable probability that without these errors, the outcome of the trial would have been different.
 {¶ 70} Accordingly, Ray's fifth assignment of error is overruled.
 {¶ 71} Having found error prejudicial to appellant herein, in the particulars assigned and argued, we reverse in part the judgment of the trial court solely as to appellant's sixth assignment of error, and remand the matter for further proceedings consistent with this opinion. The judgment of the trial court is affirmed in all other respects.
Judgment Affirmed in Part, Reversed in Part and CauseRemanded.
 Cupp, J., concurs.
 Shaw, J., concurs in judgment only.
[1] Throughout the transcripts, Officer Coffman's last name was spelled Kaufman; however, during the arguments before this Court, Ray's counsel informed us that Officer Coffman's last name was spelled "Coffman."
[2] Kenton is located in Hardin County, Ohio.
[3] Magnetic Springs is located in Union County, Ohio.
[4] Detective Justice stated that the total amount of marijuana found weighed 1001.64 grams, which is more than one kilogram. Detective Justice also stated that one pound of marijuana would weigh approximately four hundred and thirty-eight grams, so the total amount of marijuana found was slightly over 2.2 pounds. Detective Justice continued that a half ounce of cocaine would weigh approximately fourteen grams, so the total amount of cocaine found was less than half an ounce.
[5] At trial, the following exchange occurred during defense counsel's cross-examination of Ray.
Defense Counsel: [Ray's wife] gave you some very specificinformation [on February 16th] did she not?
 Officer Coffman: Yes, she did.
 Defense Counsel: She was angry with [Ray] at the time, was shenot?
 Officer Coffman: I believe so, yes.
 Defense Counsel: The information was — the specificinformation concerned a pound of marijuana and an ounce ofcocaine; correct?
 Officer Coffman: No.
 Defense Counsel: No?
 Officer Coffman: No.
 Defense Counsel: Was (Sic.) what was the information then?
 Officer Coffman: A pound of marijuana and a half once (Sic.)of cocaine.
 Defense Counsel: Half once (Sic.) of cocaine. Okay. And shetold you specifically where they were located, did she not?
 Officer Coffman: Yes.
 Defense Counsel: And you forwarded that information on toUnion County Sheriff's Department being as that's where the TackRoom's located; is that correct?
 Officer Coffman: That is correct.
(Trial Tr. pp. 36-37).
[6] The State's offer of testimony as to the original source of information being a domestic dispute, and the specific information obtained from that incident were improper and unfairly prejudicial. The State should have begun their case with the request for assistance from the liquor control agents. The source and nature of that information was immaterial. Further, the testimony as to prior investigations of Ray and the Tack Room was also improper and unfairly prejudicial and served no legitimate purpose.