{¶ 1} The defendant-appellant, Tralvis L. Welch ("Welch"), appeals the judgment of the Wyandot County Common Pleas Court convicting him of engaging in a pattern of corrupt activity following a jury's verdict and sentencing him to six years in prison.
 {¶ 2} On November 10, 2004, the Wyandot County Grand Jury indicted Welch on one count of trafficking in cocaine, a violation of R.C.2925.03(A), a felony of the fifth degree, and one count of engaging in a pattern of corrupt activity, a violation of R.C. 2923.32(A)(1), a felony of the first degree. On the charge of engaging in a pattern of corrupt activity, the grand jury charged Welch with twelve predicate offenses; six incidents of trafficking in cocaine and six incidents of possession of cocaine. The indictment specified that the value of the drugs was more than $500 and that the enterprise consisted of Welch, "Kimberly S. Winters", "Angela R. Powers", and others.
 {¶ 3} Between April 1, 2003 and May 31, 2003, Welch would purchase crack cocaine in Toledo, Ohio and transport it to Kimberly Winters' ("Winters") home in Carey, Wyandot County, Ohio where he would cut it into smaller weights for distribution. Welch sold some cocaine directly; however he also gave it to Angela Powers ("Powers") and Winters to sell for him. Because Powers did not use cocaine, she would sell it in exchange for money; however, Winters would purchase cocaine from Welch for personal use and pay for it by selling the drug to other people.
 {¶ 4} On November 8, 2006, the State of Ohio ("State") dismissed the first count of the indictment without prejudice, and the case proceeded to jury trial on the charge of engaging in a pattern of corrupt activity. The State presented testimony from six witnesses and submitted eleven exhibits into evidence. Welch cross-examined the State's witnesses, but did not present a case in chief. On November 10, 2006, the jury found Welch guilty of engaging in a pattern of corrupt activity. The jury specifically found that at least one of the twelve predicate offenses involved an amount of crack cocaine equal to or greater than five grams.
 {¶ 5} At the sentencing hearing, the trial court ordered Welch to serve six years in prison. Welch appeals the judgment of conviction and sentence and asserts the following five assignments of error:
 The trial court violated Tralvis Welch's rights to due process and a fair trial when, in the absence of sufficient evidence, the trial court found Mr. Welch guilty of engaging in a patter[n] of corrupt activity.
 The trial court violated Tralvis Welch's rights to due process and a fair trial when it entered a judgment of conviction for engaging in a pattern of corrupt activity, which was against the manifest weight of the evidence.
 The trial court erred in failing to grant a mistrial after the State's use of a prejudicial, confusing, and misleading testimony and demonstrative evidence, thereby denying Mr. Welch his rights to due process of law and to a fair trial.
 The trial court erred in failing to grant a mistrial after the State improperly called attention to Mr. Welch's exercise of his right to remain silent, denying him due process and a fair trial, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.
 The trial court denied Mr. Welch due process of law and the right to a jury trial, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, by sentencing Mr. Welch to prison based on facts not found by the jury or admitted by Mr. Welch.
 {¶ 6} For ease of analysis, we will address the assignments of error out of order.
Motion for Mistrial — Right to Remain Silent
 {¶ 7} In the fourth assignment of error, Welch contends the trial court erred by failing to grant a mistrial after the State essentially commented on his constitutional right to remain silent. At trial, the State submitted into evidence the unsigned and incomplete written statement Welch made to law enforcement, which was hand-written in a question and answer format. The parties agreed to, and did, redact those questions Welch refused to answer. On direct examination, the State asked Bill Latham ("Latham"), one of the State's investigators, "'Did there come a point in time where [the defendant] stopped answering you?'" (Bracketed material sic.). Latham answered "'Yes.'" Welch objected and moved for a mistrial. The trial court, relying on State v.Ahmed, 103 Ohio St.3d 27, 2004- Ohio-4190, 813 N.E.2d 637, overruled the motion and gave a curative instruction to the jury. Welch contends the trial court erred by not granting a mistrial because the State's question was the equivalent of commenting on his constitutional right to silence.
 {¶ 8} The State contends the question was proper, and the trial court did not err. The State argues that a single comment regarding a defendant's silence will constitute harmless error as long as the statement does not imply guilt. The State argues that neither its question nor the witness' answer implied guilt. Finally, the State contends that the trial court gave a curative instruction, and we must presume the jury followed the court's instructions.
 {¶ 9} "`Mistrials are necessary "only when the ends of justice so require and a fair trial is no longer possible."'" State v.Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 131 (quoting State v. Brinkley, 105 Ohio St.3d 231, 2005-Ohio-1507,824 N.E.2d 959, at ¶ 105 (quoting State v. Garner, 74 Ohio St.3d 49, 59,1995-Ohio-168, 656 N.E.2d 623)). Absent an abuse of discretion, we will not disturb the trial court's ruling on a motion for mistrial because "`[t]he trial judge is in the best position to determine whether the situation in [the] courtroom warrants the declaration of a mistrial.'"Ahmed, at ¶ 92 (quoting State v. Glover (1988), 35 Ohio St.3d 18, 19,517 N.E.2d 900); (citing State v. Brown, 100 Ohio St.3d 51,2003-Ohio-5059, 796 N.E.2d 506, ¶ 42).
 {¶ 10} The United States Supreme Court has held that a defendant's post-arrest and post-Miranda silence cannot be used against him for impeachment purposes. State v. Leach, 102 Ohio St.3d 135,2004-Ohio-2147, 807 N.E.2d 335, at ¶ 16 (citing Doyle v. Ohio (1976),426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91). The court later held that post-arrest and post-Miranda silence cannot be used as substantive evidence against a defendant. Id. at ¶ 17 (citing Wainwright v.Greenfield (1986), 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623). However, the Ohio Supreme Court has held that "[a] single comment by a police officer as to a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error." State v.Treesh, 90 Ohio St.3d 460, 2001-Ohio-4, 739 N.E.2d 749 (citing Meeks v.Havener (C.A.6, 1976), 545 F.2d 9, 10).
 {¶ 11} If we find Latham's testimony to be in error, we must determine whether "based upon the whole record, such error constituted harmless error beyond a reasonable doubt. This error will only be found harmless if it is clear, beyond any reasonable doubt, that absent the allusion to [Welch's silence], the jury would have returned a verdict of guilty."State v. Perez, 3rd Dist. No. 4-03-49, 2004-Ohio-4007, at ¶ 17 (citingState v. Zimmerman (1985), 18 Ohio St.3d 43, 45, 479 N.E.2d 862).
 {¶ 12} Latham testified that Welch orally confessed to him. Latham explained that after a suspect makes an oral confession, he asks the suspect to write a statement memorializing the conversation. In this case, Latham hand-wrote a series of questions, and Welch answered several questions in writing, then stopped. Prior to Latham's testimony, the State and Welch agreed to use a redacted copy of the question and answer sheet so as not to broach the subject of Welch's right to remain silent. However, during direct examination, the State asked Latham, "Did there come a point in time where he stopped answering your questions?" (Trial Tr., Vol. 1, May 25, 2006, at 278:23-24). Latham answered, "Yes." (Trial Tr. Vol. 1, at 278:25). As the State began its next question, defense counsel objected, and a discussion was held off the record. Outside the presence of the jury, counsel gave argument as to whether the testimony warranted a mistrial. The trial court relied onAhmed and denied the motion. The court discussed a curative instruction with counsel, brought the jury back into the courtroom, and instructed the jury as follows:
 THE COURT: Ladies and gentlemen of the jury, a few minutes ago before we recessed the State asked a witness a question which was similar to, at some point did he, meaning the defendant, stop answering your questions and the witness responded yes. You are instructed to completely disregard the question and answer. Obviously, every interview must come to an end. So, there will be a point in every interview where a defendant would naturally stop answering questions.Aside from that take on the question and answer just given, is that each of us have an absolute right to stop answering questions during any law enforcement interrogation. Therefore, you are to completely disregard the question and answer and not consider them for any purpose. Do you understand?
 JURY PANEL: Yes.
 THE COURT: And everyone's indicating, yes. All right.
(Trial Tr., Vol. 1 at 286-287).
 {¶ 13} Clearly, Latham's testimony cannot be used to impeach Welch because he did not testify in his own defense. Latham's testimony was a single comment without any suggestion of guilt, so it could not be used as substantive evidence of guilt. Furthermore, the State's question was an isolated reference, and the trial court gave an adequate curative instruction. "We presume that the jury followed the court's instructions, including instructions to disregard testimony."Treesh, at 480 (citing State v. Loza (1994), 71 Ohio St.3d 61, 75,641 N.E.2d 1082; State v. Zuern (1987), 32 Ohio St.3d 56, 61,512 N.E.2d 585). Faced with a more egregious set of circumstances inPerez, we noted, "[t]his is not a situation where a vague and isolated remark was made concerning the defendant's decision to request counsel. In this situation, the defendant was forced to take the stand and defend his prior silence, and the state used the prior silence to [imply] to the jury that Perez was guilty." Perez, at ¶ 22. Unlike Perez, Welch was not forced to take the stand in his own defense, and the State's question was a "vague and isolated remark" indicating that Welch had stopped answering questions. On this record, the trial court did not abuse its discretion by denying the motion for mistrial. The fourth assignment of error is overruled.
Motion for Mistrial — Demonstrative Evidence
 {¶ 14} In the third assignment of error, Welch makes two separate arguments. First, he contends the trial court erred by allowing the State to use a poster as demonstrative evidence because the poster was prejudicial, misleading, and confusing to the jury. Second, Welch contends the trial court erred when it failed to grant a mistrial based on prejudicial, misleading, and confusing testimony. Specifically, Welch moved for a mistrial based on testimony implying that the State may have had documentation to establish Welch's ownership of a cell phone.
 {¶ 15} In response, the State contends the trial court did not err in reaching its decisions. The State argues that the trial court gave a cautionary instruction to the jury and that the jury is presumed to have followed the court's instructions.
 {¶ 16} The State introduced the poster, marked as State's Exhibit 1A, during the testimony of John Cook ("Cook"), an analyst for BCI. The State represented that State's Exhibit 1A was being used by agreement, and Welch did not object to such statement. Since defense counsel did not object to the State's demonstrative use of State's Exhibit 1A, we must review the record for plain error. Pursuant to Evid.R. 103(A), a party's failure to object to the admission or exclusion of evidence bars challenge on appeal. State v. Ray, 3rd Dist. No. 14-05- 39,2006-Ohio-5640, at ¶ 11. However, the error may be reviewed if it rises to the level of plain error. Id. (citing Evid.R. 103(D)). "'Plain error occurs when, but for the error, the outcome of the trial clearly would have been otherwise.'" Id. (quoting State v. Allen, 73 Ohio St.3d 626,634-635, 1995-Ohio-283, 653 N.E.2d 675 (citing State v. Long (1978),53 Ohio St.2d 91, 96-97, 372 N.E.2d 804).
 {¶ 17} The State did not submit Exhibit 1A into evidence, and the jury was not permitted to have the exhibit during deliberations. However, any error in the exhibit's use as demonstrative evidence does not rise to plain error because the outcome of trial would not have been different without the evidence. Under Evid.R. 1006, exhibits may be used to summarize voluminous records. In this case, the State subpoenaed phone records associated with the phone numbers used by Welch, Powers, and Winters. The packet of phone records was marked as State's Exhibit 1, is approximately 3/4-inch thick, and traces phone activity between phone numbers used by Welch, Powers, and Winters. The poster was used to condense the phone records into an understandable and effective tool to assist the jury.
 {¶ 18} Welch also challenges the content of State's Exhibit 1A. The poster was captioned "Tralvis Welch, Angie Powers, and Kim Winters Engaging in a Pattern of Corrupt Activity 2003 Wyandot County, Ohio". The poster contains pictures of Winters and Powers. Under their pictures are their names, the phone numbers they primarily used, and the type of phone used (cell or home). For the information relating to Welch, the State taped a white piece of paper over the spot where Welch's picture would be. Printed below the white piece of paper is Welch's name and the cell phone number he primarily used. In between all of the pictures are arrows. The arrows indicate how many incoming and outgoing calls were placed between each phone. For example, the poster shows 137 outgoing calls from the cell phone used by Powers to the cell phone used by Welch and 120 outgoing calls from the cell phone used by Welch to the cell phone used by Powers. Similar information is displayed for each phone number.
 {¶ 19} Welch did object when Cook referred to phone calls being placed between specific people, but the trial court noted that Powers and Winters had testified as to who used each phone number. However, the court also cautioned Cook to refer to phone numbers rather than names.{¶ 20} Welch contends that State's Exhibit 1A is prejudicial because the caption on the poster is a determination of guilt. Again, Welch failed to object when the poster was displayed and the caption was read to the jury. Although such a caption is not favored with this Court, we cannot hold that the State's use of the poster rises to the level of plain error. The caption merely restates the offense charged. The jury already knew that Welch was charged with engaging in a pattern of corrupt activity, and that Powers had pled guilty to engaging in a pattern of corrupt activity as part of a negotiated plea agreement. The poster basically summarized phone activity between different phone numbers, and the material presented in State's Exhibit 1A had already been established by prior witnesses. On this record, we cannot find plain error in the State's demonstrative use of Exhibit 1A.
 {¶ 21} Cook then gave testimony implying that he may have had subscriber information for the phone numbers based on a separate investigation. At that point, Welch moved for mistrial. The trial court overruled the motion and gave the following curative instruction to the jury:
 Ladies and gentlemen of the jury, the witness gave the impression that he had records which identified phone numbers as belonging to the defendant. In fact, the witness does not profess any documentation showing any number belonging to the defendant. And, so this is being told to you to correct any misconception you may have received. The, uh, last statement of the witness should be stricken from your mind and not considered for any purpose.
(Trial Tr. Vol. 2, at 72:10-19). {¶ 22} On this record, we cannot find the trial court abused its discretion in overruling the motion. Welch could still receive a fair trial, particularly in light of prior testimony. Previously, George Gyurko ("Gyurko"), an agent with BCI, had testified that he has administrative power to subpoena phone records. Gyurko testified:
 In the past it [sic] used to have to show I.D. for the cell phone companies to give you a phone. Now, there's a trend called track phones where basically there's no I.D. needed. You, basically, have the money they'll give you a phone. You can buy phone cards or the phone is only good for a thousand minutes. After the thousand minutes the phone is useless so they throw it away.
 So, it's very difficult now to track who actually owns the phone, or the phones themselves. * * * Subscriber information will basically give you who owns that phone. But, going back a lot of people don't have to show I.D.'s anymore that becomes no information. But, I do have outgoing and incoming phone calls from that cell phone between that time period.
(Trial Tr., Vol. 1, at 140:5-14; 141:9-13). Additionally, both Powers and Winters identified the primary user of each phone number. Any implication that the State possessed subscriber information can be easily overlooked in light of the court's curative instruction, the prior testimony, and the juror's life experiences. This situation is no different than what happens everyday in American homes and businesses. Parents and employers frequently purchase cell phones for primary use by a child or employee. If third-parties were asked to testify about the phone number, they would most likely associate the number with the user; the child or the employee, not the purchaser. True ownership of the phone would be irrelevant. This is no different than the case at bar. Regardless of who owned the phones, both Powers and Winters testified that a certain phone number was primarily used by Welch, that certain phone numbers were primarily used by Powers, and that certain phone numbers were primarily used by Winters. Furthermore, both women testified to the high volume of phone calls between these numbers due to the on-going drug sales. On this record, we cannot find that Welch was denied a fair trial or that the trial court abused its discretion. The third assignment of error is overruled.
Sufficiency of the Evidence
 {¶ 23} In the first assignment of error, Welch challenges the sufficiency of the evidence. Welch contends the State produced no evidence to demonstrate an "`enterprise,' separate and distinct from the `pattern of corrupt activity'" element. Welch contends that the evidence established individual drug sales, but not the existence of an enterprise. Welch also challenges the "pattern of corrupt activity" element, arguing that the evidence merely indicates "multiple instances of possession of drugs, and trafficking in drugs, by multiple persons."
 {¶ 24} "A claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law. "Drummond, at ¶ 192 (citingState v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541). On review, we must ascertain "`whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" Id. (quoting State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus (following Jackson v.Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560)).{¶ 25} The jury was asked to determine whether Welch was guilty of engaging in a pattern of corrupt activity. R.C. 2923.32(A)(1) provides: "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity[.]" An "enterprise" is defined as "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. `Enterprise' includes illicit as well as licit enterprises." R.C. 2923.31(C).
 {¶ 26} In this case, the evidence is more than sufficient to show Welch's involvement in an "enterprise". Contrary to Welch's assertion, the record very clearly shows that he was not merely selling drugs alone. Both Powers and Winters testified that Welch bought crack cocaine from a supplier named "Man-Man" in Toledo, and that Welch supplied the cocaine they sold. Powers testified that she and Welch would travel to Toledo two or three times per week to purchase one or two ounces of crack cocaine per trip. When they returned, they would prepare the cocaine for distribution by cutting it into smaller weights at Winters' home.
 {¶ 27} Winters' testimony revealed that she sold cocaine for Welch. Winters testified that if she were bartering the price of a sale, she would call Welch at a certain phone number to approve the final price before completing the sale. Powers also testified that Welch determined the final purchase price. Winters and Powers both testified that they used cell phones to communicate with Welch and between each other. The record also shows that Welch, Winters, and Powers made calls from and to Winters' home phone number. Winters testified that she and Powers spoke on the phone "hundreds" of times concerning sales. Powers testified that Welch would call to make sure she was "okay" when she went to make a sale. The women's testimony corroborated evidence from law enforcement that an unusually high number of phone calls were being placed between the targeted different phone numbers.
 {¶ 28} Powers testified that over Memorial Day weekend 2003, she, Welch, and Winters sold crack from Winters' home in Carey. She testified that Welch made "a couple sales — only with people that he felt comfortable with", but that all of the money she and Winters collected was given to Welch. (Trial Tr., Vol. 2, at 22:15-16; 23-25). Winters estimated that during the same weekend, she sold approximately $20,000 worth of cocaine for Welch, and she was unsure about how much Welch and Powers had sold. Finally, Winters testified that when she decided to quit selling, Welch threatened physical harm to her and her children and had made other threats as well. Construing this evidence in the State's favor, any reasonable trier-of-fact could have found that Welch was operating as part of an enterprise.
 {¶ 29} The same evidence cited above also supports the "pattern of corrupt activity" element. The legislature has defined "pattern of corrupt activity" as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E). The indictment charged predicate offenses from April 1, 2003 through May 31, 2003. During that time, Welch was buying crack cocaine from "Man-Man" in Toledo, cutting the crack into smaller weights, and selling it with Powers and Winters in Carey. Both Powers and Winters testified that they communicated with Welch and each other by cell phone and through Winters' home phone. Both Powers and Winters testified that Welch set the prices for the crack they sold. On this record, the evidence is more than sufficient to establish a pattern of corrupt activity; this pattern of conduct was not a one-time deal or separate, isolated events, but an ongoing criminal enterprise. See generally State v. Baker, 3rd Dist. No. 6-03-11,2004-Ohio-2061 (testimony that appellant sold drugs on the first day of each month coupled with evidence of prior sales was sufficient to support the charge of engaging in a pattern of corrupt activity). For the reasons stated above, the first assignment of error is overruled.
Manifest Weight of the Evidence
 {¶ 30} In the second assignment of error, Welch contends his conviction was against the manifest weight of the evidence. In determining whether the verdict was against the manifest weight of the evidence:
 "`[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"
Drummond, at ¶ 193 (quoting Thompkins, at 387 (quoting State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717)).
 {¶ 31} To convict Welch of engaging in a pattern of corrupt activity, the State had to prove that Welch was involved in an enterprise, and that he was guilty of two or more of the predicate offenses; six counts of trafficking in cocaine and six counts of possession of cocaine. Although Welch contends the State has no direct evidence that he possessed cocaine, "we have previously held that `"possession" may: (a) take the form of constructive possession; (b) be proven by circumstantial evidence alone; or (c) may occur either through individual or joint possession.'" State v. Moyar, 3rd Dist. No. 2-06-10,2006-Ohio-5974, at ¶ 13 (quoting State v. Maag, 3rd Dist. No. 5-03-32,2005-Ohio-3761, at ¶ 33 (citing State v. Kelch, 12th Dist. No. CA2002-02-003, 2002-Ohio-6875; State v. Gibson (May 6, 1998), Summit App. No. 18540, unreported)). Constructive possession may be shown where the defendant knowingly exercises "'dominion and control over an object, even though that object may not be within his immediate physical possession.'" State v. Charlton, 9th Dist. No. 22638, 2005-Ohio-6982, at ¶ 27 (quoting State v. Hankerson (1982), 70 Ohio St.2d 87,434 N.E.2d 1362, at syllabus).
 {¶ 32} Having reviewed the entire record, we cannot hold that the jury clearly lost its way. The evidence shows that Welch trafficked in cocaine over Memorial Day weekend in 2003. During that weekend, Powers testified she observed Welch sell cocaine 20-30 times at Winters' home. Winters corroborated this testimony, stating that she saw Welch sell cocaine in her home to several different purchasers. Even if we assume that the Memorial Day weekend sales were a single event for purposes of R.C. 2923.31(E), the evidence is also clear that Welch possessed cocaine in Wyandot County between April 1 and May 31, 2003. Powers testified that she and Welch would travel to Toledo to purchase one or two ounces of crack cocaine, and that they made this trip two or three times per week. When they returned, they would prepare the crack for distribution by cutting it into smaller weights at Winters' home. Winters testified that, in general, she knew the drugs were crack cocaine because she was addicted to crack cocaine, and Welch would have her test a certain amount of the drug before they sold it. Both women testified that Welch set the price for the cocaine, which is clear evidence of Welch's dominion and control over the drug.
 {¶ 33} Latham testified that in March 2004, Welch wanted to speak with law enforcement, so Latham met him for an interview. During the interview, Welch admitted to selling crack cocaine in Carey in the spring of 2003, and that he had worked in concert with Powers and Winters. Latham testified that Welch admittedly sold 1,000 grams, or a kilogram, of crack cocaine in Carey. Welch also supplied the names of nine purchasers, several of which were corroborated by Winters.
 {¶ 34} Winters, Powers, and Gyurko also testified about a controlled buy set up by the Carey Police Department and executed through a confidential informant. On May 15, 2003, the confidential informant wanted to buy 28 grams, or one ounce, of crack cocaine. However, Gyurko testified that the resulting purchase was for approximately 14 grams. Gyurko testified that the confidential informant purchased the cocaine for approximately $800, and that both Winters and Powers participated in the sale. Gyurko testified that Powers "placed a phone call to an individual, uhm, and basically bartered — basically told him why he — why she was debating. It's very common to negotiate prices for drugs * * * [s]he had to defer to answer some of those questions by making — placing a phone call." (Trial Tr., Vol. 1, at 136:17-25). Although Winters did not testify as to a specific weight and price, her testimony corroborated that a controlled purchase occurred on May 15, 2003. Powers also corroborated Gyurko's testimony, confirming that the cocaine weighed approximately 14 grams and was purchased for $800. Winters and Powers both stated that Powers conferred with Welch over the phone to ascertain the price during the transaction.
 {¶ 35} During cross-examination, Welch asked Powers and Winters about the charges they faced as a result of their participation in selling drugs with Welch and about the negotiated plea agreements they had reached with the State. Although Welch highlighted some discrepancies in the witnesses' testimony and drew Winters' and Powers' credibility into question, the jury was in the best position to determine witness credibility and weigh the evidence. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. Clearly, the jury found Powers and Winters to be credible witnesses and gave little weight to the inconsistencies between the witnesses' testimony. On this record, we cannot find that a manifest miscarriage of justice resulted. The record supports a finding of guilt on at least two of the predicate offenses specified in the indictment to support the "pattern of corrupt activity" charge and also clearly supports the "enterprise" element of the charge. The evidence also supports that Welch possessed and sold more than 5 grams of crack cocaine for a price exceeding $500. The second assignment of error is overruled.
 Unconstitutional Sentence {¶ 36} In the fifth assignment of error, Welch contends the trial court erred by sentencing him to a non-minimum sentence. Welch relies onApprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348,147 L.Ed.2d 435; Blakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403; and State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470. At the time of sentencing, the trial court was required to make certain findings under R.C. 2929.14(B) prior to imposing a sentence greater than the stated lowest term. However, while his appeal was pending, the Ohio Supreme Court decided Foster. Welch contends the trial court's judgment should be reversed in light of Foster because R.C.2929.14(B) was held unconstitutional. {¶ 37} In Foster, the court found R.C. 2929.14(B) unconstitutional because it requires trial courts to make findings based on facts that have not been determined by a jury or which were not admitted by the defendant. Foster, at paragraph 3 of the syllabus (citing Apprendi; Blakely). Because the Supreme Court found R.C. 2929.14(B) unconstitutional, it determined that the sentences imposed in pending cases and those cases on direct appeal are void and must be remanded to the trial courts. Id. at ¶ 103-104. Therefore, we are required to vacate Welch's sentence and remand this cause to the trial court for a new sentencing hearing.
 {¶ 38} The judgment of the Wyandot County Common Pleas Court is affirmed in part. However, the sentence is vacated, and this cause is remanded for further proceedings.
Judgment Affirmed in Part, Sentence Vacated and Cause Remanded.
ROGERS and SHAW, J.J., concur.