[Cite as *State v. Bell*, 2015-Ohio-3817.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 12-15-01

    v.

ROBERT A. BELL,                     O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 2014 CR 0024

**Judgment Affirmed**

Date of Decision: September 21, 2015

APPEARANCES:

    *Michael J. Short* for Appellant

    *Todd C. Schroeder* for Appellee

Case No. 12-15-01

**SHAW, J.**

{¶1} Defendant-appellant Robert A. Bell ("Bell") appeals the January 23, 2015, judgment of the Putnam County Common Pleas Court sentencing Bell to an aggregate prison term of 72 months after Bell was convicted in a jury trial of two counts of Domestic Violence in violation of R.C. 2919.25(A), both felonies of the third degree due to Bell having previously been convicted of two or more Domestic Violence offenses.

{¶2} The facts relevant to this appeal are as follows. On July 3, 2014, a complaint was filed against Bell alleging that Bell committed Domestic Violence in violation of R.C. 2919.25(A), a felony of the fourth degree due to Bell having a prior Domestic Violence conviction.[1] It was alleged that on July 2, 2014, Bell pushed his girlfriend—who was also the mother of his child—to the ground in the parking lot of a hardware store.

{¶3} On July 10, 2014, a preliminary hearing was held to determine if probable cause existed to believe that Bell had committed Domestic Violence. At the hearing the alleged victim, Kelsey Cole, gave testimony that she and Bell had been arguing both on the night prior to the incident and on the morning of the incident, July 2, 2014. Kelsey testified that while she and Bell were in her vehicle, she stopped in a parking lot, got out of the car and walked around to Bell's side of

---

[1] It was later determined that Bell actually had two prior convictions in Iowa that were substantially similar to Domestic Violence convictions in Ohio.

the vehicle. Kelsey testified that Bell then got out of the vehicle and pushed Kelsey to the ground. Kelsey testified that she recalled a witness was in the area who observed the incident but she did not know who the witness was.

{¶4} Police Chief of Leipsic Dennis Cupp investigated the incident and also testified at the preliminary hearing. Chief Cupp testified that Kelsey had scrapes and bruises on her from being pushed to the ground. Chief Cupp also testified that another officer located Bell, as Bell had left the area after the incident on foot. Chief Cupp testified that Bell had stated that he had put an arm out to stop Kelsey from running at him, that Kelsey ran into his arm and then fell to the ground.

{¶5} At the conclusion of the preliminary hearing, the trial court determined that probable cause was established to believe that an offense was committed and that Bell committed the offense.

{¶6} On August 13, 2014, Bell was indicted for Domestic Violence in violation of R.C. 2919.25(A), a felony of the third degree due to Bell having two prior offenses in the state of Iowa that were substantially similar to Domestic Violence offenses in Ohio. (Doc. No. 2).

{¶7} On August 20, 2014, Bell was arraigned and pled not guilty to the charge. He was also released on bond, and as part of the conditions of his bond, he was ordered to have no contact with the victim, Kelsey Cole.

{¶8} On September 24, 2014, Bell was indicted for a second Domestic Violence incident against the same victim, Kelsey Cole. It was alleged that on September 16, 2014, while Bell and Kelsey were staying with one of Kelsey's friends, Bell struck Kelsey multiple times in front of Kelsey's friends, and that Bell had two or more prior offenses of Domestic Violence elevating the Domestic Violence to a third degree felony. Bell also pled not guilty to that charge.

{¶9} On November 6, 2014, the two cases against Bell were consolidated. (Doc. No. 58).

{¶10} On December 15-16, 2014, the case proceeded to a jury trial. At trial the State called 12 witnesses, which included a witness who had been in the parking lot at the time of the July 2, 2014, incident, and the two witnesses to the September 16, 2014, incident. Bell's counsel cross-examined the majority of the witnesses but Bell did not call any witnesses on his behalf. Neither party called the victim, Kelsey Cole, as a witness.

{¶11} After the case was submitted to the jury, the jury found Bell guilty of both counts of Domestic Violence, and also found that Bell had previously been convicted of two prior incidents of Domestic Violence in Iowa that were substantially similar to Domestic Violence crimes in Ohio.[2] A pre-sentence investigation was ordered and sentencing was set for a later date.

---

[2] The parties had actually stipulated that the Iowa offenses were substantially similar to Domestic Violence offenses in Ohio.

{¶12} On December 19, 2014, Bell, *pro se*, filed a motion for a new trial. (Doc. No. 90). In the motion, Bell argued, *inter alia*, that his trial counsel was ineffective for failing to call Kelsey Cole as a witness, as Kelsey was now indicating that she had lied about what happened in both incidents. Written statements purportedly made by Kelsey were attached to the motion stating the same. (*Id.*) In addition, Bell alleged that his counsel had improperly urged Kelsey not to testify, and warned her that she would be in danger of perjuring herself. (*Id.*)

{¶13} On January 2, 2015, Bell's trial counsel filed a motion to withdraw as counsel. (Doc. No. 101).

{¶14} On January 23, 2015, the trial court held a hearing on Bell's motion for a new trial. At the hearing, Bell primarily acted *pro se* but had stand-by counsel to assist him. In support of his motion for a new trial, Bell called Kelsey Cole to the stand, who was admonished by the court and informed of her right to remain silent. Kelsey then testified that her original written police statement[3] and her testimony at the preliminary hearing were not accurate. She testified that Bell did not cause or attempt to cause her physical harm on either occasion. Kelsey testified that she felt family pressure to state that Bell had assaulted her. After the

---

[3] Kelsey had written a three-page statement for the police after the July 2, 2014, incident.

State cross-examined Kelsey, the trial court overruled Bell's motion for a new trial. The court then proceeded to sentence Bell.

{¶15} Ultimately the trial court ordered Bell to serve 36 months in prison on each count, consecutively, for an aggregate prison term of 72 months. Bell was given credit for time served. A judgment entry memorializing this sentence was filed January 27, 2015. (Doc. No. 118). It is from this judgment that Bell appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED IN OVERRULING THE MOTION FOR A NEW TRIAL.**

**ASSIGNMENT OF ERROR 3**
**THE CONVICTIONS ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE.**

{¶16} We elect to address the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{¶17} In Bell's third assignment of error he argues that his convictions were against the manifest weight of the evidence. Specifically, Bell argues that the witnesses to the two incidents were not credible, and that Kelsey's injuries

purportedly coming from the second incident actually came from a car accident she had earlier in the evening.

{¶18} An appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Andrews,* 3d Dist. Allen No. 1–05–70, 2006–Ohio–3764, ¶ 30, quoting *Thompkins* at 387. To reverse a jury verdict as against the weight of the evidence, a unanimous concurrence of all three judges on the reviewing panel is required. *Thompkins* at syllabus.

{¶19} In this case Bell was convicted of two counts of Domestic Violence in violation of R.C. 2919.25(A)/(D)(4), which read,

> **(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.**
>
> * * *

**(D)(1) Whoever violates this section is guilty of domestic violence, and the court shall sentence the offender as provided in divisions (D)(2) to (6) of this section.**

**\* \* \***

**(4) If the offender previously has pleaded guilty to or been convicted of two or more offenses of domestic violence or two or more violations or offenses of the type described in division (D)(3)[4] of this section involving a person who was a family or household member at the time of the violations or offenses, a violation of division (A) or (B) of this section is a felony of the third degree, and, if the offender knew that the victim of the violation was pregnant at the time of the violation, the court shall impose a mandatory prison term on the offender pursuant to division (D)(6) of this section, and a violation of division (C) of this section is a misdemeanor of the first degree.**

{¶20} In order to convict Bell at trial of two counts of Domestic Violence, the State called 12 witnesses. As witnesses were called specifically to testify regarding Bell's prior convictions, the July 2, 2014, incident, and the September 16, 2014, incident, we will summarize the pertinent testimony for each category separately for ease of understanding.

### Testimony Regarding Bell's Prior Convictions

{¶21} The first witness the State called was Officer Scott Coleson, who testified that in July of 2013 Bell's probation supervision was transferred to him from Dallas County, Iowa. Officer Coleson testified that Bell had two prior

---

[4] Revised Code 2919.25 (D)(3) reads, "Except as otherwise provided in division (D)(4) of this section, if the offender previously has pleaded guilty to or been convicted of domestic violence, a violation of an existing or former municipal ordinance or law of this or any other state or the United States that is substantially similar to domestic violence * * * a violation of division (A) or (B) of this section is a felony of the fourth degree[.]"

convictions in Iowa for harassment and assault/strangulation of a family or household member. The victim in both incidents was Bell's former wife Angie. The State introduced into evidence certified copies of judgment entries of Bell's prior convictions. (State's Exs. 1, 2). The State and the defense also stipulated that the prior offenses in Iowa were substantially similar to Domestic Violence offenses in the State of Ohio.

### Testimony Regarding the July 2, 2014, Incident

{¶22} As to what occurred on July 2, 2014, the State called Ryan Hovest. Hovest testified that on July 2, 2014, he went to Village Hardware in Leipsic to buy paint thinner. According to a receipt obtained from the store, Hovest purchased the paint thinner at approximately 10:56 a.m. Hovest testified that when he walked into the parking lot after exiting the store, he observed a green car moving quickly and stopping in the parking lot. Hovest testified that he saw a girl get out of the driver's side of the vehicle and walk over to the passenger's side. Hovest testified that he could hear yelling but not specifically what was being said. Hovest testified that he then observed the man in the car get out and aggressively push the female to the ground. Hovest testified that the man was then standing over the female, screaming, or talking in a loud voice.

{¶23} Hovest testified that he then yelled to the man he identified in court as Bell that what he had done was "not cool." (Tr. at 155). Hovest testified that

Bell then began walking toward him and that Bell asked Hovest what he was going to do about it. Hovest testified that as Bell walked toward him, the female got up off of the ground, got into her car and left. Hovest testified that Bell then walked off, and Hovest got into his car and left.

{¶24} On cross-examination Hovest testified that he did not know why the individuals were upset or what happened before he observed them in the parking lot. On re-direct Hovest testified that Bell specifically pushed the victim down in a "very forceful manner" and that Hovest had plenty of room to get out of the vehicle without pushing the victim to the ground. (Tr. at 170-171).

{¶25} The State also called Paul Chamberlin.[5] Chamberlin testified that the victim, Kelsey, was his granddaughter and that on July 2, 2014, Kelsey came to him and was upset. Chamberlin testified that Kelsey's arm was bruised and she was crying. Chamberlin testified that Kelsey told him Bell had grabbed her and thrown her to the ground. On cross-examination Chamberlin testified that he called the police and then went looking for Bell with his grandson and other people from the shop that he owned. He also testified that he did not see anything, and only knew what Kelsey told him about the incident.

{¶26} The State also called Kelsey's brother—and Paul's grandson— Dalton Cole. Dalton testified that on July 2, 2014, Kelsey pulled up to his

---

[5] The trial transcript spells Chamberlin's last name as "Chamberlin;" however, we would note that in other documents in the record, such as a copy of the preliminary hearing transcript, his last name is spelled "Chamberlain."

grandfather's shop frantic and crying, and said that Bell had pulled her out of the car. Cole testified that along with his grandfather, he went looking for Bell the day of the incident.

{¶27} Regarding the July 2, 2014, incident, the State also called Dennis Cupp, the Chief of the Leipsic Police Department. Chief Cupp testified that he received a dispatch to a Domestic Violence in progress shortly before 11:30 a.m. on July 2, 2014. Chief Cupp testified that he spoke with Dalton and Paul, and that he spoke with Kelsey. He also testified that he took photographs of abrasions on Kelsey's elbow that allegedly occurred from the push, and those photographs were introduced into evidence. Cupp testified that he learned from interviewing Kelsey of the potential witness to the incident, and that he later tracked down that witness, who was Hovest.

{¶28} The State also called Kyle Stechschulte of the Leipsic Police Department, who located Bell on the date of the July 2, 2014, incident. Officer Stechschulte testified that Bell said of the incident that Kelsey had run at him, hit his arm and fell. Bell denied pushing Kelsey to the ground.

**Testimony Regarding the September 16, 2014, Incident**

{¶29} Regarding the September 16, 2014, incident, the State called Kelsey Bradley ("Bradley") who was a friend of Kelsey Cole, the alleged victim. Bradley testified that Kelsey and Bell were staying with her at her apartment for a few days

leading up to, and including, the date of the incident. On the date of the alleged incident, Bradley testified that she left her apartment shortly before 5:30 p.m. to go to a counseling session. Bradley testified that her fiancé Eric was at the residence along with Kelsey and Bell when she left.

{¶30} Bradley testified that when she returned to her residence after her counseling session, her fiancé told her that Kelsey had driven to get a bottle of liquor. Bradley testified that a man then brought Kelsey back to Bradley's apartment and said Kelsey had wrecked her car. Bradley testified that her fiancé and Bell then went to look at Kelsey's car, and when they came back, Bell was angry that Kelsey wrecked the car. Bradley testified that Bell began calling Kelsey names. Bradley testified that Bell then ripped Kelsey's shirt off of Kelsey, and pulled her bra off as well.

{¶31} Bradley testified that shortly thereafter they were all inside and Bell struck Kelsey in the head and Kelsey fell to the ground. Bradley then specifically testified,

> **I asked them to take it out of the room because my 2-year-old son was laying** [sic] **on the couch sleeping right there. [Bell] then was continuously hitting [Kelsey] and smacking her because she was not coming to after he had punched her in the face. He drug her out into my kitchen and again took her top off her and was pinching at her nipples, pulling at her nipples. And then she started saying ow. And he continuously then started with you're a nasty whore. I'm nasty. Who is nasty now, you stupid bitch. Very mean stuff is what he was saying to her, hitting her, kicking her, punching her, and choking her.**

-12-

(Tr. at 238). Bradley testified that she was present and specifically observed the strikes. As a result, Bradley testified that she called Kelsey's brother Dalton and he called the police. Kelsey testified that the police eventually responded and Kelsey was taken to St. Rita's in Lima for treatment.

{¶32} On cross-examination Bradley testified that Kelsey could be difficult to control when she was intoxicated. Bradley also testified that when Kelsey fell to the ground she was not sure if Kelsey lost consciousness. In addition, Bradley testified that she recalled Kelsey kicking Bell at one point.

{¶33} The State also called Bradley's fiancé, Eric Fischnich. Fischnich testified that on September 16, 2014, he went to work and after work he came to Bradley's residence. Fischnich testified that shortly after he arrived Bradley left to go to a counseling session. Fischnich testified that around 6 p.m. Kelsey left to go purchase some liquor, and about thirty minutes later Kelsey came back with a guy who said Kelsey had wrecked her car.[6] Fischnich testified that he went out to look at the vehicle with Bell, to see if anything could be done. Fischnich testified that afterword he and Bell returned to Bradley's residence.

---

[6] The State called several witnesses related to Kelsey's crash. The State called Craig Closson who, from approximately 100 yards away, observed the vehicle later identified as Kelsey's jump railroad tracks. Closson testified that the vehicle bottomed out and was obviously damaged as the engine was "really knocking" but it drove away. (Tr. at 211). The State also called Shaston Adair who testified that Kelsey's vehicle came to rest on his property, and that he took Kelsey back to Bradley's residence and informed everyone there about the vehicle. In addition, the State called Officer Tammy Griffith of the Ottawa Police Department who located Kelsey's disabled vehicle.

{¶34} Fischnich testified that upon returning to Bradley's residence, Bell and Kelsey got into an altercation. Fischnich testified that Bell took Kelsey to the ground and dragged her into the kitchen. Fischnich testified at that point Kelsey started to kick at Bell, but only after Bell had started getting physical. Fischnich testified that he then saw Bell draw his fist back to strike Kelsey. Fischnich testified that from his angle in the next room where he was standing he could not see if Bell actually did punch Kelsey at that moment, but he testified that he could hear repeated strikes and he could hear Kelsey saying "ouch, Rob get off of me, stop." (Dec. 16, 2014, Tr. at 24). Fischnich testified that he remained in the living room until he heard Kelsey say, "get him off of me, he's going to kill me." (*Id*.) Fischnich testified that he then walked into the kitchen and told Bell to get out of the house, and Bell left.

{¶35} Fischnich testified that after the incident inside the house, Kelsey had gone outside and was walking into traffic yelling for Bell to come back. Fischnich testified that after Kelsey was nearly struck by a vehicle on the highway, he called the police because he could not control her. Fischnich testified that Bell left on foot before the police arrived.

{¶36} Officer Shane Vance of the Ottawa Police Department testified that he responded to Bradley's residence on September 16, 2014. Officer Vance testified that when he arrived he found Kelsey with no shirt or bra on outside and

observed bruising on her. Officer Vance testified that Kelsey was intoxicated and was taken to St. Rita's for medical treatment. Officer Vance testified that he got statements from those who were present. On cross-examination Officer Vance testified that he was dispatched for a woman running down the middle of the street, and he also testified that Kelsey was uncooperative, intoxicated, and out of control.

{¶37} Kelsey's brother Dalton also testified about the September 16, 2014, incident, corroborating that Bradley had called him and told him what was going on. Dalton testified that Bradley did call him as she testified, and that he ultimately called the police and requested that they respond to Bradley's residence.

### Manifest Weight of the Evidence Analysis

{¶38} Based on the foregoing testimony, Bell was convicted of Domestic Violence against Kelsey for both the July 2, 2014, and the September 16, 2014 incidents. The jury also specifically found that Bell had two prior Domestic Violence offenses in Iowa that were substantially similar to Domestic Violence offenses in Ohio. Bell now argues on appeal that his convictions were against the manifest weight of the evidence.

{¶39} For the July 2, 2014, incident, Bell argues that the witness, Ryan Hovest, was not credible because he did not call the police himself after observing Bell push Kelsey to the ground. Bell argues that if Hovest would have thought

that the incident was serious, he would have called the police. However, Hovest testified that Kelsey had driven off and he thought that since she was not with Bell or in immediate danger that was enough for him at that moment. In addition, how serious Hovest considered the event is irrelevant to the fact that the event happened and constituted a crime. The jury elected to believe Hovest's version of events, which likely looked particularly credible given the fact that he did not know Kelsey or Bell and just happened to be in that parking lot at the time of the incident.

{¶40} Bell also argues that Hovest did not know what transpired prior to the incident he witnessed, and therefore was not credible. However, what transpired prior to what Hovest witnessed does not change the physical action that Hovest did specifically witness. Thus Hovest's lack of knowledge regarding earlier arguments does not diminish his credibility.

{¶41} As the jury elected to believe Hovest's uncontradicted testimony, we cannot find that the jury clearly lost its way or that there was a manifest miscarriage of justice in convicting Bell of Domestic Violence for the July 2, 2014 incident. Moreover, we similarly cannot find that the jury lost its way in finding that Bell had previously been convicted of two prior Domestic Violence offenses, elevating his Domestic Violence to a third degree felony. Bell's argument as to the July 2, 2014 incident is thus not well taken.

{¶42} Bell next argues that his conviction for the September 16, 2014, incident was against the weight of the evidence. Specifically, Bell contends that Kelsey's injuries could have come from her car accident. In addition, Bell argues that Fischnich's testimony was unreliable because he was more specific at trial than he had been originally in his written police report.

{¶43} First, regarding Kelsey's injuries, it is possible that some or all of the marks on her came from her car accident that evening. However, that some or all of the marks on her came from the car accident does nothing to alter the fact that two witnesses testified that they specifically witnessed and/or heard Bell striking Kelsey. Bradley specifically testified that she witnessed Bell hitting Kelsey in the head, and repeatedly slapping various parts of her body. Fischnich specifically testified that he witnessed Bell draw back as if to punch Kelsey, and while he did not see the fist strike, he heard what sounded like repeated hits, and then he heard Kelsey asking for Bell to stop. That Fischnich was more detailed in his testimony at trial compared to what he had written on the page does not change the fact that the jury elected to believe him.

{¶44} Nevertheless, even if the jury elected not to believe Fischnich, they still could have relied on Bradley's testimony to convict Bell. Thus we cannot find that the jury clearly lost its way in convicting Bell of Domestic Violence or that there was a manifest miscarriage of justice. Similarly, we cannot find that the

jury improperly determined that Bell had two or more prior Domestic Violence convictions based on the evidence elevating the Domestic Violence to a third degree felony. Accordingly, Bell's third assignment of error is overruled.

*Second Assignment of Error*

{¶45} In Bell's second assignment of error he argues that the trial court erred in overruling his motion for a new trial. Specifically, Bell argues that there was a "substantial irregularity" in the proceedings due to trial counsel's failure to call the alleged victim, Kelsey, as a witness.

{¶46} Generally, a trial court's decision to deny a motion for a new trial will not be disturbed on appeal absent an abuse of discretion. *State v. Keith*, 3d Dist. Crawford No. 03-10-19, 2011-Ohio-407, ¶ 41, citing *State v. Ray,* 3d Dist. Union No. 14–05–39, 2006-Ohio-5640, ¶ 53 (additional citations omitted). An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶47} In this case, after Bell's jury trial but prior to sentencing, Bell, proceeding *pro se*, filed a motion for a new trial alleging, *inter alia*, that his trial counsel was ineffective for failing to call the victim, Kelsey. The trial court held a hearing on Bell's motion for a new trial, at which Bell presented Kelsey's testimony. Kelsey took the stand and testified that she had lied about Bell causing

or attempting to cause her harm both in the written statement she had given to the police and at the preliminary hearing. Kelsey testified that she lied at the behest of family members who had, in her words, pressured her to maintain testimony against Bell.

**{¶48}** On cross-examination Kelsey admitted that she had been talking to Bell throughout his criminal proceedings. She also admitted that she spoke with Bell's attorney prior to trial, that Bell's attorney had reasons why she should not testify and that she agreed with them at the time.

**{¶49}** After hearing Kelsey's testimony and Bell's arguments, the trial court overruled Bell's motion for a new trial. Bell now renews his arguments on appeal, claiming that the trial court abused its discretion in denying him a new trial.

**{¶50}** At the outset, we would note that in domestic violence cases,

> **it is not uncommon for the complaining witness to change her story, 'forget' details, or recant for any one of a variety reasons including threats of reprisal or genuine reconciliation."** [Internal citation omitted]. **It is, therefore, the purpose of the domestic violence statute to impose criminal sanctions upon assaultive behavior even though the relationship between the couple may be marked by cyclical periods of fighting and harmony.**

*State v. Smith*, 3d Dist. Seneca No. 13-03-25, 2003-Ohio-5461, ¶ 11; *see also State v. Brown*, 3d Dist. Allen No. 1-97-74, 1998 WL 227182, *2 (May 8, 1998). Kelsey's change of heart is thus not particularly unique or surprising.

{¶51} Moreover, it seems evident that Kelsey would have virtually no credibility at trial, and therefore it would be well within the ambit of trial strategy to elect not to call a witness that had so clearly made diametrically opposing statements in a case. Furthermore, even had Kelsey testified at trial, her testimony regarding both incidents would directly contradict the testimony of disinterested witnesses. Ryan Hovest, the witness from the July 2, 2014, incident did not even know Kelsey or Bell and had no motive to lie. Both Bradley and Fischnich witnessed a portion of the events of September 16, 2014, and there is no indication that they had a motive to be untruthful either. Kelsey's testimony thus would not only be inconsistent with her own prior statements, but also the statements of disinterested witnesses.

{¶52} We would note that when Bell filed his motion for a new trial, he seemed to be under the impression that if the victim in a Domestic Violence case recanted her story the perpetrator could not be prosecuted. That idea is wholly inaccurate. While in some scenarios it might make a Domestic Violence incident more difficult to prosecute, it would in no way prevent the State from moving forward with charges. Here, the State actually had witnesses to both incidents and did not need the victim to testify regardless.

{¶53} Bell has presented no arguments to this Court establishing that he was entitled to a new trial. Thus we cannot find that the trial court abused its

discretion in denying Bell's motion for a new trial. Accordingly, his second assignment of error is overruled.

*First Assignment of Error*

**{¶54}** In Bell's first assignment of error he argues that he received ineffective assistance of trial counsel. Specifically, Bell argues that counsel was ineffective for failing to call Kelsey as a witness, that counsel improperly told Kelsey not to appear at court for the trial, and that Kelsey could have testified that she was not actually struck in either of the incidents.

**{¶55}** In order to succeed on a claim of ineffective assistance of counsel, an appellant must show that his trial counsel was deficient and that such deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 669 at paragraph two of the syllabus, 104 S.Ct. 2052 (1984). Specifically, an appellant must establish 1) that the trial counsel's representation fell below an objective standard of reasonableness, and 2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* adopted by Ohio in *State v. Bradley*, 42 Ohio St.3d 136 (1989). "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Schlosser*, 3d Dist. Union No. 14-10-30, 2011-Ohio-4183, ¶ 20, citing *State v. Waddy*, 63 Ohio St.3d 424, 433

(1992), superseded by constitutional amendment on other grounds as recognized by *State v. Smith,* 80 Ohio St.3d 89, 103, 1997–Ohio–355.

{¶56} As we stated in the discussion of the previous assignment of error, there were a number of legitimate reasons Bell's trial counsel could have relied upon to determine not to call Kelsey as a witness at trial. Moreover, even if Kelsey was called as a witness, her testimony would have contradicted her own previous multi-page statement to the police and her own preliminary hearing testimony. Furthermore, her testimony would have contradicted the multiple disinterested witnesses who testified as to the two incidents. Therefore, we cannot find that trial counsel was ineffective for electing not to call Kelsey as a witness, or that even if he had called her it would have made any difference to the outcome of the trial. Bell's argument on this issue is thus not well-taken.

{¶57} Next, Bell argues that his counsel was ineffective, and violated the rules of professional conduct governing attorneys, by telling Kelsey she should not testify because she would be charged with perjury and telling her not to appear in court. Bell argues that his attorney's obligation was to Bell and Bell's attorney acted as though he was representing Kelsey.

{¶58} First, we would note that any question of a violation of the rules of professional conduct is a question not before this Court.[7] Second, it is not

---

[7] We are in no way suggesting that would be a meritorious claim.

improper regardless for Bell's attorney to advise Kelsey that if she were to testify she would be in danger of perjuring herself. That is simply a statement of fact. Third, while Kelsey indicated that Bell's trial counsel told her not to be at the trial, we fail to see how that would be prejudicial if she was not going to be called as a witness anyway.

{¶59} We cannot find based on the record before us that Bell received ineffective assistance of counsel or that any alleged deficiencies altered the outcome of the trial. Therefore, Bell's arguments are not well-taken, and his first assignment of error is overruled.

{¶60} For the foregoing reasons Bell's assignments of error are overruled and the judgment of the Putnam County Common Pleas Court is affirmed.

*Judgment Affirmed*

**ROGERS, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**