[Cite as *State v. Jack*, 2024-Ohio-5594.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-27 |
| | : | |
| v. | : | Trial Court Case No. 24CRB00044 |
| | : | |
| JERRY S. JACK | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 27, 2024

. . . . . . . . . . .

NICOLE K. DIETZ, Attorney for Appellant

DANIELLE E. SOLLARS, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Jerry S. Jack appeals from a judgment of the Xenia Municipal Court convicting him of domestic violence following a bench trial. For the

following reasons, we will reverse the judgment in part and remand the cause for the limited purpose of resentencing Jack after calculating the appropriate amount of jail-time credit that should be awarded to him. We will affirm the judgment in all other respects.

I.      Facts and Course of Proceedings

{¶ 2} On January 16, 2024, Jack received a citation for one count of domestic violence, a first-degree misdemeanor in violation of R.C. 2919.25, and one count of assault, a first-degree misdemeanor in violation of R.C. 2903.13. According to the narrative supplement issued with the citation, police officers had been dispatched to an apartment on Cincinnati Ave in Xenia for a domestic violence incident. When officers arrived, they "found that Jack had struck his live in girlfriend on her right cheek bone. The victim had a small injury on her cheek and eye area. The victim filled out a witness statement about the incident."

{¶ 3} A trial was scheduled for February 2, 2024. The victim failed to appear for the trial on that date and it was rescheduled. On March 6, 2024, the State moved to revoke Jack's bond based on an alleged violation of a condition of his bond. According to the State, despite being ordered to not have any contact with the victim, Jack had contacted her several times on March 6, 2024, and was "recorded instructing [the victim] to contract amnesia for purposes of the bench trial."

{¶ 4} The bench trial was rescheduled to March 13, 2024. Xenia Police Officer Cody Fout testified first at the trial. *Id.* at 6-17. He had been a certified peace officer since 2021. On January 16, 2024, he was dispatched to Cincinnati Avenue in Xenia in

response to a call from a female who stated that her boyfriend had assaulted her. When he arrived at the address around 3 a.m., Jack was sitting in the living room, and the victim was on the bed in the bedroom. According to Officer Fout, the victim "was frantic and she was speaking very quickly when talking to me." *Id.* at 7. Officer Fout testified that his body camera recorded his conversation with the victim. The State introduced the body camera footage at the trial, and Officer Fout confirmed that it was true and accurate footage taken from his body camera. Jack objected to the introduction of the body camera video, arguing that it was hearsay and did not fit within the present sense impression or excited utterance exceptions to the rule against hearsay. The trial court overruled the objection.

{¶ 5} At one point on the body camera video, Officer Fout asked the victim to stop because "[s]he was speaking frantically and I wanted to be able to understand her clearly." *Id.* at 10. Officer Fout also testified that the victim "informed me that she woke up to [Jack] choking her, which is common language that people use in exchange for strangulation. And I asked her if he said anything, and she said that he went and laid back down on the couch. And later on when I was speaking with her, she did give the excuse that he sleepwalks is what she said." *Id.* at 11. While watching the replay of the body camera footage, counsel for the State asked Officer Fout whether he knew why the victim was fidgeting with her phone. Officer Fout explained that "[s]he seemed shaky. Like I said, she was frantic. She kept alluding to a recording that I was trying to get her to pull up." *Id.* at 11-12. Officer Fout had the victim complete a witness statement based on her statements that she had been assaulted earlier in the night and then subsequently

strangled. Based on the victim's statement and visible injury under the victim's eye, the police charged Jack with domestic violence. Officer Fout noted that Officer Harding took photos of the victim's injury. Officer Fout testified that he had been to that residence two or three times in the previous year and the victim and Jack cohabitated there.

{¶ 6} On cross-examination, Officer Fout testified that he did not see any signs of petechial hemorrhaging in the victim's eyes. He also did not notice any marks around her neck. He noted that the victim told him that she had had one or two beers within the previous 6-8 hours. Officer Fout acknowledged that speaking frantically also could be a sign of the use of drugs or alcohol.

{¶ 7} Xenia Police Officer Everett Harding testified next. *Id.* at 18-26. He had been a certified peace officer for almost five years. On the early morning of January 16, 2024, he was dispatched to an address on Cincinnati Avenue related to a domestic violence incident. He was present when pictures were taken of the upper part of the victim's cheek, where she said Jack had struck her with the bottom of her cell phone. Both he and Officer Fout interviewed the victim. Officer Harding described the victim's emotional demeanor as follows:

> She was what I believe to be pretty frantic. I let Officer Fout do a lot of the questioning. She was - - her voice was really raspy. She was very - - it was very hard for me to understand her. I have difficulty hearing, so I let him ask a lot of the questions but she seemed real frantic. Like I said, I couldn't really understand what she was saying but she was talking really fast and seemed pretty emotional about it.

*Id.* at 22.

**{¶ 8}** On cross-examination, Officer Harding noted that the January 16, 2024 photograph of the victim showed a scratch and a little bit of redness. He did not personally observe any redness around the victim's throat. Officer Harding agreed that the victim indicated that the injury to her cheek had occurred "a number of hours" before she had called the police. *Id.* at 26.

**{¶ 9}** The victim testified next. *Id.* at 27-47. She stated that she had been living with Jack on Cincinnati Avenue since July 2023. She agreed that she had called 911 and that the voice on the 911 call was hers. The victim thought Jack had choked her while she was sleeping. She explained at trial that she had been on new medication the night she called 911 and that she was having nightmares. She was visually impaired from a previous, traumatic brain injury. The victim conceded that she had claimed that Jack had choked her but did not recall stating that he had hit her until she was shown the body camera recording from the night of the incident.

**{¶ 10}** On cross-examination, the victim explained that she took anxiety pills and antidepressants. In January 2024, her physician switched her to new pills. She had some nightmares of someone hovering over her after Jack was sent to jail, so she believed she may have imagined Jack choking her rather than it actually having happened. According to the victim, Jack told her that he did not try to choke her but instead was shaking her to get a cigarette from her. The victim stated that she really loves Jack. She had a couple of beers on the night she called the police. She also was having a "bad eye day."

**{¶ 11}** After the victim testified, Jack moved pursuant to Crim.R. 29 for a dismissal of the case. The trial court overruled the motion. Jack then testified last at the trial. Trial Tr. 51-58. He stated that he did not hit or choke the victim on January 16, 2024. The victim had consumed four 25-ounce beers from 2 p.m. until 1 a.m. She also was taking Remeron that night, which Jack characterized as a "psych med." On cross-examination, Jack testified that the victim was not taking several medications that night. He agreed that it was his voice on a January 26, 2024 phone call with the victim and that the victim did not mention in that phone call that she had dreamed of the domestic violence as a result of her medication. Jack stated on that phone call that he had shaken her to wake her up to get a cigarette from her. He believed the victim actually thought domestic violence had occurred that night but "she had a traumatic brain injury unfortunately. It's not her fault that things aren't as they appear. She's a special needs person." *Id.* at 57.

**{¶ 12}** The trial court found Jack guilty of domestic violence and not guilty of assault. On April 2, 2024, the trial court held a sentencing hearing. After reading the presentence investigation report and listening to the arguments of the parties and a statement by Jack, the trial court ordered the following sentence: "So it will be a two hundred and fifty dollar fine plus costs. Hundred and eighty days in jail; give you credit for time served; suspend thirty. We're adjourned." Sentencing Tr. 7. On that same day, the trial court issued a judgment entry that reflected this sentence. Jack filed a timely notice of appeal.

II.    The Trial Court Committed Plain Error by Not Specifying the Total Number of Days of Jail-Time Credit

{¶ 13} Jack's first assignment of error states:

THE TRIAL COURT ERRED BY FAILING TO NOTIFY THE APPELLANT OF THE TOTAL NUMBER OF DAYS OF JAIL-TIME CREDIT TO WHICH HE WAS ENTITLED TO PURSUANT TO R.C. 2929.19(B)(2)(g)(i).

{¶ 14} Jack argues that the trial court erred by failing to identify the total number of days of jail-time credit to which he was entitled. According to Jack, " '[w]here, for whatever reason, a defendant remains in jail prior to his trial, he must be given credit on the sentence ultimately imposed for all periods of actual confinement on that charge.' " Appellant's Brief, p. 8, quoting *State v. Russell*, 2015-Ohio-3373, ¶ 37 (2d Dist.). Jack cites R.C. 2929.19(B)(2)(g)(i) in support of his argument.

{¶ 15} The State responds that Jack's reliance on R.C. 2929.19(B)(2)(g)(i) is misplaced. According to the State, "a plain reading of section R.C. 2929.19 indicates that this section is controlling only for felony convictions. As Appellant was convicted of a misdemeanor violation of Domestic Violence, R.C. § 2929.19 does not apply, and Appellant's First Assignment of Error is moot." Appellee's Brief, p. 4-5.

{¶ 16} The State is correct that R.C. 2929.19(B)(2)(g)(i) does not control Jack's jail-time credit. However, that does not end our analysis. "Whether a defendant is convicted of a felony or a misdemeanor offense, under Ohio law, both are afforded jail-time credit for time served." *Bratenahl v. Eldridge*, 2021-Ohio-1083, ¶ 9 (8th Dist.). The

concept of jail-time credit "is codified in R.C. 2967.191 for offenders sentenced to prison, and in R.C. 2949.08 for offenders sentenced to jail." *State v. Smiley*, 2013-Ohio-4495, ¶ 8 (8th Dist.), citing *State v. Hargrove*, 2013-Ohio-1860, ¶ 6 (1st Dist.). "Both statutes require a sentence to be reduced by the total number of days an offender was confined 'for any reason arising out of the offense' for which the offender was convicted and sentenced." *Id.*, citing R.C. 2967.191 and 2949.08(C)(1).

{¶ 17} Specific to this appeal, under R.C. 2949.08, when a trial court sentences a person convicted of a misdemeanor to a jail term, it is required to "specify the total number of days, if any, that the person was confined for any reason arising out of the offense for which the person was convicted and sentenced" so that the person's sentence is appropriately reduced. R.C. 2949.08(B), (C). The statute's terms are mandatory.

{¶ 18} A review of the record reveals that Jack neither filed a motion with the trial court requesting the calculation of jail-time credit nor objected to the trial court's failure to calculate and award any credit. Therefore, we review the trial court's failure to award jail-time credit for plain error. *State v. Williams*, 2018-Ohio-1297, ¶ 10 (8th Dist.), citing *State v. McClellan*, 2011-Ohio-4557, ¶ 39 (7th Dist.). Since the provisions of R.C. 2949.08 are mandatory, the trial court's failure to properly calculate jail-time credit and include it in the body of the judgment entry constitutes plain error. *Id.* at ¶ 14, citing *State v. Miller*, 2005-Ohio-1300, ¶ 10 (8th Dist.).

{¶ 19} The record is clear that the trial court did not specify the number of days that Jack was confined for any reason arising out of the domestic violence offense. Therefore, on remand, the trial court must calculate the number of days of jail-time credit

to which Jack is entitled and resentence him accordingly.

{¶ 20} The first assignment of error is sustained.

III.    The Trial Court Did Not Err by Overruling Jack's Crim.R. 29 Motion

{¶ 21} Jack's second assignment of error states:

THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION FOR ACQUITTAL (CRIM.R. 29) WHERE THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO PROVE EACH ELEMENT OF R.C. 2929.25(A).

{¶ 22} "Crim. R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction for the charged offense." *State v. White*, 2014-Ohio-1446, ¶ 9 (2d Dist.).   " 'Reviewing the denial of a Crim. R. 29 motion therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim.' "   *Id.*, quoting *State v. Witcher*, 2007-Ohio-3960, ¶ 20 (6th Dist.).

{¶ 23} In reviewing a challenge to the sufficiency of evidence, we determine whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.   *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.   "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."   *Id.*, citing *Jackson v. Virginia*, 443 U.S. 307 (1979).   Our review is not to determine "whether the state's evidence is to

be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

{¶ 24} Jack contends that there was not sufficient evidence to support his conviction for domestic violence. According to Jack, the victim's "sworn testimony at trial was in direct conflict with what she told arriving officers at the scene. During trial, [the victim] denied that [Jack] was doing anything to cause her harm and instead testified that [Jack] was simply attempting to shake her awake to ask for a cigarette. . . . [Jack's] own testimony aligns itself with [the victim's] testimony as well." Appellant's Brief, p. 9.

{¶ 25} The State responds that the evidence of record was sufficient to prove that Jack "knowingly caused physical harm to a family or household member." Appellee's Brief, p. 5, quoting R.C. 2919.25(A). The State contends that the victim's testimony established that she and Jack had been residing together for at least six months at the time of the January 2024 incident. Further, the victim told Officer Fout and Officer Harding that she woke up to Jack choking her, which led her to call 911. According to the State, Officer Fout corroborated the statements made by the victim and noticed a visible injury under the victim's eye, and Officer Harding took photos of the injured area. Based on this evidence, the State argues it provided sufficient evidence to convict Jack of domestic violence despite the victim's "apparent change in statements." *Id.* at 6.

{¶ 26} The offense of domestic violence is proscribed by R.C. 2919.25, which provides in pertinent part as follows: "(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member." A "family or household member" includes "a person living as a spouse," which is defined as "a person who is living or has

lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(1)(a)(i) and (2). "The burden of establishing cohabitation is not substantial." *State v. Woullard*, 2004-Ohio-3395, ¶ 73 (2d Dist.), citing *State v. Young*, 1998 WL 801498 (2d Dist. Nov. 20, 1998).

{¶ 27} There was sufficient evidence to prove that the victim was a family or household member. The victim testified that she had been living with Jack for five or six months immediately before the January 2024 incident. When asked whether she relied on Jack to help her with the things she has to take care of on a day-to-day basis, the victim stated that "I rely on him being my partner." Trial Tr. 39. The victim also testified that "I really love JJ, Jerry Jack." *Id.* at 42. Jack testified that he lived with the victim in the apartment on Cincinnati Avenue in Xenia. Further, Officer Fout testified that he had been dispatched to the victim's residence two or three times in the previous year and the victim and Jack were cohabitating.

{¶ 28} The evidence provided by the State was also sufficient to prove that Jack had knowingly caused or attempted to cause physical harm to the victim. State's Exhibit 3 was photo evidence obtained the night of the alleged incident that showed a scratch and redness under the victim's right eye where Jack had hit her with her phone. In addition, the victim's statements to the police officers on the night of the incident and the statements she made in the two recorded phone calls with the 911 operator supported the domestic violence conviction.

{¶ 29} Despite this evidence, Jack argues that the victim's recanting of her previous statements to the police required the trial court to grant his Crim.R. 29 motion. The sole authority he cites in support of his position is *State v. Attaway*, 111 Ohio App.3d 488 (1st Dist. 1996). In *Attaway*, an officer was dispatched to a residence where he saw a woman with Attaway. The woman was crying, obviously intoxicated, and had a swollen and bloody lip with scratches on her neck. She informed the officer that Attaway had punched, kicked, stomped, and choked her. At trial, the woman recanted the statements she made to the arresting officer and testified that her injuries were sustained while she was on a drinking binge and became involved in an altercation with another woman on the street. "[The woman] further testified under cross-examination that she had lied to the officer and implicated Attaway because he was trying to get her off the street and away from alcohol." *Id.* at 489. The trial court overruled Attaway's Crim.R. 29 motion and found him guilty of domestic violence.

{¶ 30} On appeal, the First District noted that "the record is bereft of any extrinsic corroborating evidence from which to conclude that [the victim's] statement to the arresting officer was more credible than her recantation under oath." *Id.* at 491. The court concluded:

> Concededly, the conflict between the testimony of the arresting officer and Attaway concerning whether he attributed the assault to a third person at the time of his arrest afforded the trial court some basis to discredit his testimony. Even so, however, the only evidence arrayed against him consisted of the recanted, uncorroborated testimony of the state's

prosecuting witness. His alleged statement at the time of his arrest to the effect that "this happens all the time" can just as readily be interpreted as referring to [the victim's] alcoholism as to an admission of guilt.

In sum, we hold that the credibility of [the victim's] first statement, which is otherwise uncorroborated and completely contradicted by her sworn testimony at trial, is so inherently suspect that the statement is insufficient as a matter of law to establish Attaway's guilt beyond a reasonable doubt.

*Id.*

**{¶ 31}** In *State v. Pallai*, 2008-Ohio-6635 (7th Dist.), the Seventh District criticized the *Attaway* decision. According to the court, "*Attaway* was a holding limited to the specific facts of the case, and further limited in subsequent cases within that district." *Pallai* at ¶ 21, citing *State v. Pettit*, 1999 WL 12759 (1st Dist. Jan. 15, 1999). Further, the *Pallai* court noted that "the opinion in Attaway predated the Ohio Supreme Court opinion of *Thompkins*, which solidified the distinction between sufficiency and manifest weight analyses. *Attaway* appears to be one of those cases that mixes the two analyses, as did many Ohio decisions prior to the clarification in the *Thompkins* decision." *Id.* at ¶ 22, citing *Thompkins*, 78 Ohio St.3d 380. Finally, the Seventh District stated that "although this court would be loath to confuse coincidence with causation, we cannot help but note that the First District has not cited or relied upon *Attaway* in any of its cases since its holding in *Pet[t]it*." *Id.*

**{¶ 32}** We agree with the Seventh District and the First District's decision in *Pettit*

that the *Attaway* decision should be limited to the specific facts before it. Unlike the facts in *Attaway*, the record before us does not establish that the victim's statements to the police were inherently suspect or that she had a clear motive to make up a story that Jack hit her and choked her. While the victim speculated at trial that she may have imagined or dreamed the choking incident due to the number of different medications she was taking at the time of the domestic violence incident, Jack's own testimony contradicted the victim's testimony that she was taking multiple medications at that time. Further, even if we were to conclude there was not sufficient evidence to prove the choking happened because it might have been something the victim had dreamed rather than actually experienced, this would not explain away the victim's statements to the police and to the 911 operator that Jack had hit her in the face. Also, unlike in *Attaway*, the victim's statement in this case that Jack struck her was corroborated by the photographic evidence and testimony by the police officer. Finally, we must acknowledge that:

> it is not uncommon for the complaining witness to change her story, "forget" details, or recant for any one of a variety reasons including threats of reprisal or genuine reconciliation. . . . It is, therefore, the purpose of the domestic violence statute to impose criminal sanctions upon assaultive behavior even though the relationship between the couple may be marked by cyclical periods of fighting and harmony.

*State v. Bell*, 2015-Ohio-3817, ¶ 50 (3d Dist.), quoting *State v. Smith*, 2003-Ohio-5461, ¶ 11 (3d Dist.).

{¶ 33} Overall, the evidence submitted at trial, when viewed in a light most

favorable to the prosecution, could lead a rational trier of fact to find the essential elements of the crime of domestic violence had been proven beyond a reasonable doubt. Therefore, the trial court did not err in overruling Jack's Crim.R. 29 motion.

{¶ 34} The second assignment of error is overruled.

IV.     The Trial Court Did Not Abuse Its Discretion by Admitting into Evidence the Video from the Police Officer's Body Camera

{¶ 35} Jack's third assignment of error states:

THE TRIAL COURT ERRED BY ALLOWING STATEMENTS FROM THE OFFICER FOUT'S BODY CAM TO BE PLAYED AS IT WAS INADMISSIBLE HEARSAY THAT DID NOT FALL UNDER ANY HEARSAY EXCEPTION PURSUANT TO OHIO EVID. R. 803.

{¶ 36} "A trial court has broad discretion in the admission of evidence." *State v. Edmonds*, 139 Ohio App.3d 298, 300 (2d Dist. 2000), citing *State v. Robb*, 88 Ohio St.3d 59, 68 (2000). "Decisions regarding the admission or exclusion of evidence will not be disturbed absent an abuse of that discretion." *State v. Graham*, 58 Ohio St.2d 350, 352 (1979). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985).

{¶ 37} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted in the statement." Evid.R. 801(C). Hearsay is not admissible unless an exception applies. Evid.R. 802. "The excited-utterance exception to the hearsay rule provides that a statement is not excluded by the hearsay rule even though the declarant is available as a witness if the statement relates to a startling event or condition while the declarant was under the stress of excitement caused by the event or condition." *State v. Harr*, 2004-Ohio-5771, ¶ 121 (2d Dist.), citing Evid.R. 803(2). "The exception derives its guaranty of trustworthiness from the fact the declarant is under such a state of emotional shock that his reflective processes have been stilled. Therefore, statements made under these circumstances are not likely to be fabricated." *Id.*, citing 2 McCormick, *Evidence*, § 272 (5th Ed. 1999).

**{¶ 38}** The Ohio Supreme Court has set forth a four-part test to determine whether or not a statement falls within the excited-utterance exception. The Court stated that such testimony may be admissible where the trial court reasonably finds:

(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and

declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

*Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus.

{¶ 39} Jack challenges on appeal whether the State proved the second part of this four-part test. Jack argues that the State did not prove that the victim's statements in the body camera footage were made while she was still under the stress of excitement caused by the domestic violence incident. According to Jack:

By the time Officers arrived at the scene, approximately an hour after the call was made, [Jack] was sitting in the living room by himself while [the victim] was in a separate room of the house and clearly some time had passed since the alleged crime had taken place. Both parties had time to themselves, and the testimony of the officers that [the victim] was talking quickly and frantically when they entered the bedroom is not enough to satisfy the second pre-requisite for an excited utterance.

Appellant's Brief, p. 11. Jack also argues that the victim's statements did not fall under the present sense exception to the rule against hearsay because "none of the statements [the victim] is making on the body cam are either during or right after the alleged altercation." *Id.*

{¶ 40} The State responds that "the statement made by the victim occurred while

she was still under the stress of the events of the night." Appellee's Brief, p. 7. In support of this argument, the State cites the testimony of Officer Fout, who described the victim as frantic, speaking quickly, shaky, and unable to perform basic motor functions. Further, the State points to the testimony of Officer Harding that the victim was talking really fast and seemed pretty emotional about the incident. According to the State, "under the circumstances presented at trial, the statement made by [the] victim could reasonably be construed to have occurred while the victim was still under the stress of the events of the night, and the Trial Court did not abuse its discretion in admitting the statement into the record." *Id.*

{¶ 41} Based on our review of the record and relevant caselaw, we conclude the trial court did not abuse its discretion when it found that the video from the police officer's body camera fit within the excited utterance exception in Evid.R. 803(2). Officers Fout and Harding testified about the frantic and emotional demeanor of the victim while she described to them the events from earlier that night. The statements to the police officers about the alleged choking occurred shortly after the incident happened and she made the 911 call. Those statements clearly fit within the excited-utterance exception. The more difficult question is whether the victim's statements about being hit in the cheek were excited utterances. As the victim noted in the body camera footage, Jack had hit her in the cheek anywhere between two and five hours before she spoke with the police officers. The analysis is further complicated by the fact that the victim fell asleep at some point between the time Jack hit her and when she called 911.

{¶ 42} Although the passage of time between the event and the declaration is

relevant, "[t]here is no per se amount of time after which a statement can no longer be considered to be an excited utterance." *State v. Taylor*, 66 Ohio St.3d 295, 303 (1993). In fact, to be an excited utterance, the statement need not be strictly contemporaneous with the startling event. *State v. Duncan*, 53 Ohio St.2d 215 (1978), paragraph one of the syllabus. " '[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.' " *Taylor* at 303, quoting *Duncan* at 219-220. Thus, the relevant inquiry is whether the declarant is still under the stress of the event or whether the statement was the result of reflective thought. *Duncan* at 219-220.

{¶ 43} The testimony of Officers Fout and Harding established that the victim was "emotional," "frantic," and "shaky." There is nothing in the record that would indicate the victim engaged in reflective thought in the interim between the commission of the crime and when she called 911 and spoke with the officers. *See Duncan* at 221-222. Further, "[a] period of unconsciousness, even an extended period, does not necessarily destroy the effect of a startling event upon the mind of the declarant for the purpose of satisfying the excited-utterance exception to the hearsay rule." *State v. Wallace*, 37 Ohio St.3d 87 (1988), paragraph one of the syllabus. According to the victim's statements, she fell asleep at some point after Jack hit her in the face. She then awoke to Jack with his hands on her throat, which at least initially made her think Jack was choking her. At the time the police officers spoke with her, it was clear that she was still nervous and excited as a direct result of her belief that Jack had hit her and attempted to choke her. Based

on the specific record before us, including the police officers' testimony about the victim's demeanor when they arrived and spoke with her and the video evidence showing a frantic and emotional victim, we cannot conclude that the trial court abused its discretion in allowing the admission of the body camera footage.

**{¶ 44}** The third assignment of error is overruled.

V.    Conclusion

**{¶ 45}** Having sustained Jack's first assignment of error, we will reverse the judgment in part and remand the cause for the limited purpose of resentencing Jack after calculating the appropriate amount of jail-time credit that should be awarded to him.   We will affirm the judgment of the trial court in all other respects.

. . . . . . . . . . . . .

EPLEY, P.J. and HUFFMAN, J., concur.